**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | | |
|---|---|---|
| ECOLAB INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.:** |
| | ) | |
| JOHN SCOTT SHANKLIN and | ) | 3:23CV-215-CHB |
| WASHING SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF<br>AND MONETARY DAMAGES</u>

Plaintiff Ecolab Inc. ("Plaintiff" or "Ecolab"), by its undersigned counsel, hereby files its Verified Complaint for Injunctive Relief and Monetary Damages against John Scott Shanklin ("Shanklin") and Washing Systems, LLC ("Washing Systems") (collectively, "Defendants") stating as follows:

## <u>INTRODUCTION</u>

1.      Ecolab brings this action to enforce its legal rights to stop its former employee, Shanklin, from further misappropriating, improperly using, and illegally disclosing Ecolab's highly confidential and trade secret information for his use and for the benefit of his new employer, Defendant, Washing Systems, Ecolab's top competitor in textile care and water treatment in the commercial laundry industry. Specifically, Ecolab seeks injunctive and equitable relief, as well as all appropriate damages, against Shanklin and Washing Systems for: (1) Shanklin's breach of the non-disclosure, return of property, noncompetition and nonsolicitation covenants contained in his Management Employment Agreement ("Agreement") attached hereto as **Exhibit A**; (2) Shanklin's

misappropriation of trade secret information for the benefit of himself and Washing Systems in violation of federal and Kentucky trade secret laws; and (3) Washing Systems' tortious interference with respect to Shanklin's Agreement with Ecolab.

2.      As Assistant Vice President for Ecolab's Textile Care Division, Shanklin was a high-level executive with access to highly confidential and proprietary information relating to Ecolab's customers, business programs, departmental strategies, and innovations. Ecolab held this material as highly confidential and took appropriate preventative measures to protect this information including, but not limited to, requiring Shanklin to execute the Agreement with nondisclosure, noncompetition, nonsolicitation, and return of property provisions.

3.      On March 14, 2023, Shanklin abruptly resigned from his employment with Ecolab, without notice.

4.      Upon information and belief, Shanklin has recently become employed as Director of Business Development at Washing Systems, Ecolab's top competitor in the areas of textile care and water treatment for the commercial laundry industry, the same divisions over which Shanklin presided at Ecolab. Shanklin's employment with Washing Systems is in direct violation of the noncompete provisions of his Agreement.

5.      Following his departure, and upon learning of his new position, Ecolab discovered that, just before his resignation, Shanklin accessed and downloaded numerous confidential and trade secret files onto a personal external USB device, without authorization or any legitimate business purpose. These documents include, but are not limited to, confidential and trade secret information relating to programs and services provided to customers by Ecolab and contact information for Ecolab employees.

6.      Since his resignation, Shanklin has failed to return his company-owned cell phone

FP 46928137.2

and delayed return of his two company-owned laptops, which were only recently received as of April 24, 2023. In other words, Shanklin continued to have unfettered access to Ecolab's highly confidential and trade secret information for a month and a half after his resignation, while working for a direct competitor as its Director of Business Development, both of which are intentional and wanton violations of his contractual and legal duties owed to Ecolab.

7.     Ecolab is informed and believes that Shanklin and Washing Systems intend to use Ecolab's confidential and trade secret information in order to unfairly compete with Ecolab with regard to an upcoming request for proposal (RFP) to one of Ecolab's largest clients in the textile and water treatment disciplines.

8.     Defendants' unlawful conduct has already caused, and has the potential to continue to cause, tremendous damage and irreparable harm to Ecolab. In this action, Ecolab seeks preliminary and permanent injunctive relief enjoining Defendant from continuing to possess, utilize, and/or disclose Plaintiff's confidential and trade secret information and requiring Defendant to preserve and return all wrongfully retained company property. Ecolab also asks this Court to enforce the restrictive covenants Shanklin executed as part of his Agreement, including those provisions regarding noncompetition and nonsolicitation.

### THE PARTIES

9.     Plaintiff Ecolab Inc. is a Delaware corporation with its principal place of business in the State of Minnesota. Ecolab is registered to do business, and regularly conducts business, in the Commonwealth of Kentucky.

10.     Defendant John Scott Shanklin is a resident of the State of Kentucky and resides at 10604 Taylor Farm Court, Prospect, Kentucky 40059.

11.     Defendant Washing Systems, LLC is an Ohio limited liability company with its

principal office at 167 Commerce Drive, Loveland, Ohio, 45140. Washing Systems is registered to do business in Kentucky, and its registered agent for service in Kentucky is Corporation Service Company, 421 West Main Street, Frankfort, Kentucky, 40601. Washing Systems Intermediate Holdings, Inc. is the sole member of Washing Systems, LLC. Upon information and belief, Washing Systems Intermediate Holdings, Inc. is incorporated in the State of Delaware and has its principal place of business in the state of Ohio.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this Complaint by virtue of federal question jurisdiction under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA") and pursuant to 28 U.S.C. § 1331.

13.     This Court has supplemental jurisdiction over Ecolab's state law claims pursuant to 28 U.S.C. § 1367, as the claims derive from a common nucleus of operative facts and are therefore so related to the claims under the DTSA that they form part of the same case or controversy.

14.     This Court has personal jurisdiction over Shanklin by virtue of his residence and citizenship in the State of Kentucky.

15.     This Court has personal jurisdiction over Washing Systems because it is a corporation doing business within the jurisdiction of this Court, is registered to do business in the State of Kentucky, and its wrongful acts have caused injury to Plaintiff in Kentucky. Washing Systems conducts a significant amount of business in Kentucky.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred in this district.

4

## FACTUAL ALLEGATIONS

### Ecolab's Business, Confidential Information, and Trade Secrets

17.    Ecolab is a global sustainability leader offering water, hygiene and infection prevention solutions and services that protect people and the resources vital to life. Building on a century of innovation, Ecolab delivers comprehensive science-based solutions, data-driven insights and world-class service to advance food safety, maintain clean and safe environments, optimize water and energy use, and improve operational efficiencies for customers around the world.

18.    Ecolab's Textile Care Division provides comprehensive commercial laundry services to customers in a wide variety of industries. With over 80 years as a global provider, Ecolab offers innovative and data-driven cleaning technology, smart solutions, and personal consulting services to help customers improve their commercial laundry operations.

19.    Ecolab's offerings in the Textile Care Division include: (1) commercial laundry dispensing solutions for commercial laundry operations; (2) commercial laundry detergents and commercial wash products which utilize customized chemical formulations to serve customer needs such as disinfection, stain removal, and textile care; (3) complete water and energy solutions, including water conservation, treatment, and waste disposal, that help commercial laundries reduce energy and water usage while still producing high quality filtration and clean textile results; and (4) commercial laundry data intelligence, including an innovative intelligence platform that delivers data-driven insights to customers in real time which helps customers optimize energy and water use, manage operational risks, and reduce expenses.

20.    Ecolab invests heavily in its Textile Care Division by employing local industry experts, global engineers, and highly experienced scientists to develop solutions for customers and

5

in order to best understand customer needs. As a result, Ecolab's Textile Care Division provides cutting edge dispensing processes, chemical formulations, waste and water treatment solutions, and technology to its customers that are highly specialized, not generally known in the industry or public domain, and which would be highly valuable to Ecolab's competitors.

21.    For example, in 2021, the Ecolab Textile Care Division and ProTEX Plus program won the Clean Green Innovation Award. This prize honors outstanding efforts to reduce environmental impact, and meet TRSA energy and water conservation standards.

22.    Management of textile care and water treatment systems is a highly competitive business, and Ecolab's customers, partners, and vendors are critical to their success in the growing and competitive market.

23.    Because Ecolab partners with companies across a wide range of industries to develop individualized solutions for each customer's specific textile care, water treatment, technological needs, and business goals, such specialized information pertaining to each customer is proprietary in nature and would be highly valuable to Ecolab's competitors.

24.    As otherwise stated herein, Ecolab has invested, and continues to invest, considerable sums of money in developing products, product formulations, dispensing solutions, equipment, training programs, sales programs, technical service programs, and innovations in the areas of textile care and water treatment, as well as in maintaining account records for the proper servicing of their current customers and potential future customers.

25.    Ecolab has developed and maintains a substantial amount of trade secret, confidential and proprietary information, including but not limited to: business plans and strategies; customer pricing and pricing strategies; marketing and business prospect strategies; product development and chemical formulations; dispensing solutions and customer processes;

6

branding, packaging and advertising development; brand portfolio strategies; vendor/supplier relationships; global supply chain; customer lists, preferences, product formulations, and plans; the specific types of services performed for customers and clients; the type of equipment ordered or installed for customers or clients; business partner relationships and agreements; strategies for proposals in the marketplace; discount structures; channel development; software and technology development; technical specifications; and intellectual property ("Trade Secret and Confidential Information").

26.    Ecolab's Trade Secret and Confidential Information was developed over many years, with a substantial investment of labor, skill, money, and knowledge gained from experiences with customers, partners, technical experts, vendors, as well as other outside entities and agencies, among others.

27.    Ecolab's Trade Secret and Confidential Information is highly valuable, not generally known outside of the company, and would be of significant value to Ecolab's competitors if wrongfully disclosed to such entities. Ecolab derives a competitive advantage and independent economic value, both actual and potential, from its Trade Secret and Confidential Information, because the Trade Secret and Confidential Information is not generally known to the public or to others who can obtain economic value from its disclosure or use.

28.    In order to protect its Trade Secret and Confidential Information, Ecolab, among other things, requires employees, including Shanklin, to execute agreements tailored to protect their valuable company assets, including by: (1) requiring employees to hold Trade Secret and Confidential Information in a fiduciary capacity for the benefit of the Company; (2) prohibiting employees from misusing or wrongfully disclosing Trade Secret and Confidential Information; (3) requiring employees to conduct Company business and communicate with Company customers,

7

vendors, and the public regarding Company business only on the Company computer network and by using Company-provided or approved electronic technology; (4) prohibiting employees from transferring or storing Company information onto any device or storage medium (physical or virtual) not provided or authorized in writing by the Company; (5) prohibiting departing employees from wiping, deleting or transferring any Company data from any electronic devices before returning such devices to the Company; (6) requiring employees to acknowledge and agree that employees have no right to privacy regarding any Company property and as such that Company has the right to conduct forensic examination(s) of any Company computers and/or electronic devices issued to employees or authorized for employee use for Company business; and (7) requiring employees who separate from the Company to return all company property, data, business information, phones, computers, and electronic devices.

29.     Ecolab also strictly requires the use of computer passwords, limits access to Trade Secret and Confidential Information only to employees that need the information to perform their duties for the Company, maintains confidentiality policies in employee handbooks, maintains electronic communication and code of conduct policies regarding confidentiality, and stresses the importance of maintaining confidentiality to protect Trade Secret and Confidential Information.

30.     Ecolab also uses a secure computer network to store and maintain their proprietary, Trade Secret and Confidential Information.

### Shanklin's Employment and Acquisition of Trade Secret and Confidential Information

31.     Shanklin was employed in the Ecolab Textile Care Division from 2010 until his abrupt resignation on March 14, 2023. From approximately June 2021 until March 14, 2023, Shanklin held the position of Assistant Vice President ("AVP") of Sales for Ecolab Textile Care Division.

FP 46928137.2

32.     As the AVP of Sales, Shanklin was responsible for: (1) the management, oversight, business development, contract management, sales, services, internal reporting, and strategy for the Textile Care Division including, but not limited to, determining and executing business strategies, marketing, customer relations, and product and service placement; (2) leading the Textile Care Division service employees who touched all 700 plus customer accounts for the Ecolab Textile Care Division; and (3) personally managing all aspects of certain large corporate customer accounts, with direct corporate communications and strategy development for two of Ecolab's largest Textile Care Division accounts, Aramark Uniform Services (AUS) and K-BRO Linen Systems (K-BRO).

33.     For example, Shanklin was responsible for all aspects of AUS's customer account with the Ecolab Textile Care Division, and he was involved in all major communications, decision-making, and dealings with AUS. AUS provides a wide variety of uniform and textile rentals to its customers, and has significant laundry and water treatment solution needs. AUS utilizes Ecolab's textile care products, innovative detergents, specialty chemicals, injection and dispensing systems, and water solutions such as wastewater treatment and water reuse strategies.

34.     Under Shanklin's leadership, Ecolab's Textile Care Division was working to expand its water treatment, reuse, and filtration services, and to develop cutting edge technologies and processes for its customers in the areas of textile care and water treatment.

35.     In order to perform his duties, Shanklin was privy and given access to certain Ecolab's Trade Secret and Confidential Information, as otherwise described herein, including but not limited to, individualized customer service information, pricing, business strategies, chemical formulations, dispensing processes, water treatment goals and needs, and technology. Shanklin was also privy to Ecolab's trade Secret and Confidential Information relating to Ecolab's internal

business strategies, marketing information, pricing plans and goals, product formulations, and the development of business strategies and technologies.

### In Exchange for Valuable Consideration, Shanklin Agrees Not to Compete or Solicit for a Period of Eighteen Months

36.     On December 20, 2019, while serving in his former role as a Senior Corporate Accounts Manager at Ecolab, Shanklin executed the Agreement attached hereto as **Exhibit A**.

37.     Shanklin executed prior employment agreements with Ecolab in 2010 (as a condition of his initial employment with Ecolab) and 2015. The December 2019 Agreement states that, except in limited circumstances of lack of consideration or enforceability, the Agreement "supersedes any previous agreements between Employee and Company, written or oral, relating to this subject matter and may be amended or modified only by a writing signed by Employee and a corporate officer of Company." **Exhibit A**, ¶ 15.

38.     In addition to this offer and acceptance, Ecolab provided Shanklin with significant and valuable monetary consideration in exchange for his execution of the Agreement in December 2019. Specifically, on or about December 12, 2019, Ken Dowdy, as Ecolab's Vice President of Corporate Accounts, sent Shanklin an email notifying him that he would receive a Long-Term Incentive Bonus of 52 units valued at $9,588 as "consideration" for his subsequent execution of the Agreement, as follow:

> Ecolab regularly reviews and updates our various employment agreements as a course of sound business practice. We have updated our Management Agreement and will require all U.S. Executives to sign the updated agreement in consideration for your annual December long-term incentive grant. You will receive a task in the coming week in your Workday "in box" to review and electronically sign the updated Management Agreement.

39.     Thereafter, Shanklin executed the Agreement and his long-term incentive of 52 units vested in December 2022.

FP 46928137.2

40.     The Agreement contains the following non-competition and non-solicitation covenants, which prohibit Shanklin, for a period of eighteen (18) months from his last day of employment (March 14, 2023), from engaging in the following:

    (a) Employee will not within the Restricted Territory (as defined below) render services to a Conflicting Organization (as defined below) in any role or position that is the same or substantially similar to any position Employee held at the Company in the eighteen (18) month period immediately preceding Employee's cessation of employment with the Company;

    (b) Employee will not solicit, encourage or induce any Customer (as defined below) for the purpose of providing them a Conflicting Product or Service (as defined below);

    (c) Employee will not transact business with any Customer, for the purpose of providing a Conflicting Product or Service;

    (d) Employee will not within the Restricted Territory provide services to a Conflicting Organization in any position in which any reliance on the use or disclosure of the Company's Confidential Information to which Employee was exposed during the last eighteen (18) months of Employee's employment with the Company would inevitably support or facilitate the performance of Employee's duties for a Conflicting Organization…

**Exhibit A**, ¶ 9(a)-(d).

41.     The "Restricted Territory" in the Agreement is the United States. **Exhibit A**, ¶ 9.

42.     Under the Agreement, "Conflicting Organization" means any organization "which is engaged in or is about to become engaged in the research on, or the development, production, marketing or sale of, or consulting pertaining to, a Conflicting Product or Service." *Id*.

43.     "Conflicting Product or Service" means "any product or process of, or service by, any person or organization other than Company, in existence or under development, which is the same as or similar to or improves upon or competes with a product or process of, or service rendered by, Company which Employee either worked on, performed or sold during Employee's last eighteen (18) months of their employment by Company." *Id*.

44.     The Agreement defines "Customer of the Company" as a customer with whom Shanklin, in the past twelve (12) months:

      i.     Had material business contact with on behalf of the Company; or

     ii.     Whose account was assigned to Employee; or

    iii.     Whose account was assigned to another employee that Employee supervised or managed; or

    iv.     About or from whom Employee received confidential information.

*Id.*

45.     Aramark and K-BRO, among other businesses, are Customers of the Company as defined by the Agreement, and Shanklin was their Corporate Account Representative for the last twelve months of his employment.

### Shanklin Agrees to Hold the Company's Trade Secret and Confidential Information in a Fiduciary Capacity

46.     As additional consideration, the Agreement indicated Shanklin would be provided training and exposure to Ecolab's Trade Secret and Confidential Information:

> While employed with the Company, Employee has and will continue to receive valuable training and has been and will be entrusted with sensitive, confidential information about the Company. In return, Employee agrees not to use this training and information to unfairly compete against the Company. Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.
>
> …
>
> Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, margins, business strategies, business methods, product formulae, and employees (including the particular skills, talents and abilities of those employees).
>
> …

12

The Company will train Employee in Employee's particular management position and will provide Employee with special techniques and information, including Confidential Information, which the Company believes will be helpful and necessary to the performance of Employee's duties.

**Exhibit A**, Introduction; ¶ 2.

47.     As part of the Agreement, Shanklin acknowledged that the "Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers." **Exhibit A**, Introduction.

48.     Shanklin also acknowledged that he was "being hired or promoted by the Company into a management position where Employee will have an opportunity to help shape, supervise and carry out strategic business plans and opportunities for the Company." *Id*.

49.     The Agreement defined Trade Secrets as follows:

information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

(a) derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

**Exhibit A**, ¶ 2.

50.     With regard to Trade Secrets, Defendant agreed to hold such information "in a fiduciary capacity for the benefit of Company" and not to "directly or indirectly, use or disclose" any such information that he "may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret." *See* **Exhibit A**, ¶ 2.

51.     The Agreement defines Confidential Information as:

Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of the Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term Confidential Information shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by the Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment from the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information. .

**Exhibit A**, ¶ 2.

52.     With regard to Confidential Information, Shanklin agreed that "while employed with the Company and for a period of three (3) years after termination of Employee's employment with Company" he would hold such information "in a fiduciary capacity for the benefit of Company" and would not "directly or indirectly, use or disclose" any such information "that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company." *See* **Exhibit A**, ¶ 2.

53.     The Agreement also required that, upon termination of employment or upon Company request, Shanklin would:

[R]eturn in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in Employee's possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned

phone and/or computer device.

**Exhibit A**, ¶ 12.

54.     With regard to notice, the Agreement requires as follows:

If Employee's new employer could be construed as a Conflicting Organization (as defined in Section 9), Employee will inform Employee's new employer, prior to accepting employment, of the existence of this Agreement and provide such employer with a copy. Employee will provide to the Company written assurances satisfactory to the Company describing Employee's position and that it will not compromise the Company's customers and/or Confidential Information, and will not violate the terms of this Agreement.

**Exhibit A**, ¶ 8.

55.     Further, Shanklin also agreed that in the event he violates the terms of the

Agreement, or Ecolab reasonably believes he is about to violate the Agreement, Ecolab shall be:

[E]ntitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

**Exhibit A**, ¶ 13.

56.     The Agreement also states that "[i]n any successful proceeding brought to enforce

the Company's rights under this Agreement, the Company shall recover court costs and

reimbursement of Company's attorney's fee and disbursements. These damages are in addition to

any other relief, including injunctive relief, to which the Company may be entitled." **Exhibit A**,

¶ 18.

FP 46928137.2

**Shanklin's Plan to Misappropriate Ecolab's Highly Sensitive, Confidential and Trade-Secret Information and Subsequent Resignation Without Notice**

57.　　On or about February 2023, AUS announced that it was putting Ecolab's contract under review and allowing two of Ecolab's competitors to submit RFPs to bid for the services currently being provided by Ecolab to AUS. Shanklin was provided this information as part of his role as AVP of Sales and AUS Account Manager.

58.　　Unbeknownst to Ecolab, on or about late February and early March 2023, without any business purposes and without Ecolab's consent, Shanklin downloaded certain Trade Secret and Confidential Information from his Ecolab-issued laptop onto a personal USB device. These materials included AUS reports, presentation materials, and account reviews, as well as other proprietary information relating to other accounts, Ecolab's field agent contact information, and Ecolab internal strategic initiatives. Many of the documents downloaded were marked as "CONFIDENTIAL" or had other indicia of their restricted use. The documents and information downloaded constituted Ecolab's Trade Secret and Confidential Information.

59.　　On March 14, 2023, Shanklin abruptly resigned his employment with Ecolab without any prior notice.

60.　　On March 16, 2023, in-house counsel for Ecolab sent Shanklin a notice reminding him of his "continued obligations" under the Agreement, providing him a courtesy copy of the same. Specifically, this communication called Shanklin's attention "to the noncompete and confidentiality provisions of the Agreement (see Paragraphs 2 and 9), which remain effective following [his] separation from employment." The letter further stated:

> As you are well aware, Ecolab is engaged in a highly competitive business. We have invested considerable sums of money in developing products, equipment, training and sales manuals and programs, technical service programs, and account records for the proper servicing of our customers. While employed with Ecolab, you received valuable training and were entrusted with confidential information from our records. In return for this training and information, we asked you to sign

FP 46928137.2

the enclosed Agreement. We believe that the restraints imposed upon you by this Agreement are reasonable and necessary to protect our business and the income of present employees. We have and will continue to take legal action where necessary to enforce these Agreements.

61.      As of the date of this filing, Shankin has failed to return his Company cell phone. Shanklin delayed return of his two Company-owned laptops, which was only recently received as of April 24, 2023. In other words, Shanklin continued to have unfettered access to Ecolab's highly confidential and trade secret information for a month and a half after his resignation, while working for a direct competitor as its Director of Business Development

### Shanklin Goes to Work for Washing Systems, Ecolab's Top Competitor in Textile Care and Water Treatment

62.      Ecolab recently learned that Shanklin may be employed by its direct competitor, Washing Systems, as the Director of Business Development. Shanklin is believed to be working remotely from his residence in Prospect, Kentucky.

63.      Washing Systems touts itself as providing "efficient, sustainable solutions for the commercial and specialty cleaning markets." Washing Systems is a direct competitor with Ecolab's Textile Care Department in the areas of commercial laundry products, services, and purported innovation. Washing Systems conducts a significant amount of business in Kentucky, including commercial laundry contracts with large corporate accounts in Kentucky.

64.      Upon information and belief, Washing Systems intends to expand its business to water treatment. Shanklin's role with Washing Systems will involve business development, client relations, and sales similar to his roles as AVP of Sales and Corporate Accounts Manager for Ecolab.

65.      Upon information and belief, Washing Systems intends to submit a RFP relating to the AUS customer account later this year and intends to use Ecolab Trade Secret and Confidential Information obtained through Shanklin's employment with Ecolab to provide Washing Systems

17

with an unfair business advantage.

66.    Ecolab's ability to investigate the full nature of Defendants' transgressions has been significantly hindered by Shanklin's failure to timely return his Ecolab-issued laptops and cell phone. Ecolab was able to perform a limited remote scan of information downloaded before Shanklin's resignation that flagged document titles later discovered to contain Trade Secret and Confidential Information. Ecolab has only just begun to uncover the full extent of Defendants' misappropriation of Ecolab's Trade Secret and Confidential Information.

67.    The files illegally transferred by Shanklin onto his personal USB device before his resignation are highly sensitive, confidential, and constitute Ecolab's Trade Secret and Confidential Information.

68.    Upon information and belief, at times relevant to this Complaint, Shanklin was acting as an agent for, on behalf of, with the knowledge of, subject to control by, and/or for the benefit of his new employer and Ecolab competitor, Washing Systems. The type of information illegally transferred and retained by Shanklin would be highly valuable to Washing Systems as one of Ecolab's top competitors in the areas of textile care and water treatment. Further, Washing Systems had reason to know of Shanklin's post-employment duties owed to Ecolab, because Ecolab recently informed Washing Systems of similar post-employment restrictions appliable to another former Ecolab employee.

### Washing Systems Is Responsible for Shanklin's Misconduct

69.    Shanklin acted within the course and scope of his duties and authority as an agent and/or employee of Washing Systems when committing the actions alleged herein.

70.    Shanklin acted with the purpose and intent to serve and benefit Washing Systems when committing the actions alleged herein.

FP 46928137.2

71.     Shanklin benefitted Washing Systems when committing the actions alleged herein.

72.     Washing Systems was aware of Shanklin's wrongful conduct and authorized, encouraged, or permitted Shanklin to commit the wrongful actions alleged herein during the time he was employed by Washing Systems.

73.     Ecolab has suffered damages as a result of the wrongful conduct committed by Defendants, and Washing Systems is liable to Ecolab under principles of *respondeat superior* and vicarious liability for Shanklin's conduct.

<u>**Ecolab Is Entitled to Injunctive Relief**</u>

74.     Ecolab will suffer significant losses if Shanklin and Washing Systems are permitted to retain and/or use Ecolab's Trade Secret and Confidential Information. As a result of Shanklin's and Washing System's unlawful conduct and competition with Ecolab, Ecolab has lost and will continue to sustain injuries and loss of goodwill with its clients.

75.     Ecolab is entitled to temporary, preliminary, and permanent injunctive relief preventing any actual or threatened misappropriation and misuse of its Trade Secret and Confidential Information by Defendants and/or their agents, and other persons who are in active concert or participation with them (collectively, "Covered Persons").

76.     This injunctive relief should include, without limitation, an Order prohibiting Covered Persons from using or disclosing any of Ecolab's Trade Secret and Confidential Information in any manner.

77.     Further, the injunctive relief should include an Order requiring the Covered Persons to return to Ecolab, and not retain in their possession, custody, or control, any and all Trade Secret and Confidential Information of Ecolab, and to certify under oath that all Trade Secret and Confidential Information has been returned.

FP 46928137.2

78.     In addition, Ecolab is entitled to temporary, preliminary, and permanent injunctive relief restraining Shanklin, for a period of 18 months, from conducting, carrying on, or engaging in any competitive business, including any competitive business that was developed and/or implemented, in whole or in part, directly or indirectly, through the use of any Ecolab's Trade Secret and Confidential Information.

79.     Ecolab has a substantial likelihood of prevailing on the merits of its claims.

80.     Unless the Covered Persons are enjoined from the conduct described herein, there is a substantial threat that Ecolab will continue to suffer irreparable harm, including loss and misuse of its Trade Secret and Confidential Information, goodwill, and financial losses that presently are not calculable.

81.     The irreparable harm that Ecolab will suffer if injunctive relief is denied outweighs the potential harm (if any) to Defendants if injunctive relief is granted.

82.     Granting the requested injunctive relief will not disserve the public interest.

83.     Ecolab has no adequate remedy at law.

84.     Consequently, Ecolab is entitled to injunctive relief as set forth herein.

**<u>COUNT I</u>**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1831 *et seq.*)**
**Against Defendants Shanklin and Washing Systems**

85.     Plaintiff adopts and re-avers the allegations set forth above in each of the preceding paragraphs of the Complaint.

86.     Ecolab developed and Shanklin was privy and given access to certain Ecolab Trade Secret and Confidential Information, as otherwise described herein, including but not limited to, individualized customer service information, pricing, business strategies, chemical formulations, dispensing processes, water treatment goals and needs, and technology. Shanklin was also privy to Ecolab's Trade Secret and Confidential Information relating to Ecolab's internal business

20

strategies, marketing information, pricing plans and goals, product formulations, and the development of business strategies and technologies. The forgoing information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

87.     In February and early March 2023, without any business purposes and without Ecolab's consent, Shanklin downloaded certain Trade Secret and Confidential Information from his Ecolab-issued laptop onto a personal USB device. These materials included AUS reports, presentation materials, and account reviews, as well as other proprietary information relating to other accounts, Ecolab's field agent contact information, and Ecolab internal strategic initiatives. Many of the documents downloaded were marked as "CONFIDENTIAL" or had other indicia of their restricted use. The documents and information downloaded constituted Ecolab's Trade Secret and Confidential Information.

88.     The information, documents, and materials stolen and misappropriated by Defendant constitute trade secrets within the meaning of, and subject to protection under, the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*.

89.     Ecolab regularly transacts business throughout the United States, including in person and by phone, internet, and mail, and their trade secrets relate to this business and are used in interstate commerce.

90.     Shanklin acquired Ecolab's trade secrets by improper means, including, but not limited to, knowingly accessing, downloading, and using this information in violation of his contractual duties owed to Ecolab.

91.     The information contained in these documents is valuable because it is not

generally known or readily accessible, through proper means, to others who can profit from its use. Ecolab has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

92.     Ecolab takes, and at all times here relevant, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include restricting availability of confidential information to key employees, requiring key employees (like Shanklin) to execute agreements with confidentiality provisions and restrictive covenants, physical security measures to protect against the disclosure of sensitive materials to third parties, and IT security efforts, including the Agreement executed by Shanklin in 2019, as well as similar agreements at the commencement of employment and later in his employment with Ecolab.

93.     By accessing Ecolab's computer network without authorization and downloading and retaining its trade secret information after his separation from Ecolab, Shanklin has committed both an actual and threatened misappropriation and misuse of Ecolab's trade secret information in violation of the DTSA.

94.     Upon information and belief, and as Ecolab expects to establish through further investigation and discovery, Shanklin has improperly retained, used, and/or disclosed (and continues to retain, use, and/or disclose) confidential business information and strategies and trade secrets contained in the documents and information he took or disclosed from Ecolab without authorization and in breach of his contractual duties owed to Ecolab in order to compete against Ecolab.

95.     Shanklin engaged in this conduct despite acquiring this information without authorization.

96.     Washing Systems is liable vicariously and under principles of *respondeat superior*

for Shanklin's misappropriation, since Shanklin improperly used or disclosed Ecolab's Trade Secret and Confidential Information while working as an employee of Washing Systems and Washing Systems benefitted from his wrongful actions.

97.    As a direct and proximate result of Shanklin's actual and threatened misappropriation of Ecolab's trade secrets which benefitted Shanklin and his subsequent employer Washing Systems, Ecolab has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Shanklin and Washing Systems are enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Ecolab.

98.    To the extent that Shanklin has already provided Ecolab's trade secrets or other confidential information to Washing Systems or third parties, those parties should also be ordered to return and/or destroy that information.

99.    As a direct and proximate result of Shanklin's misappropriation, Ecolab has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA. Each of the acts of misappropriation was done willfully and maliciously by Shanklin and Washing Systems to unfairly compete against Ecolab and benefit himself and Washing Systems, thereby entitling Ecolab to exemplary damages to be proved at trial.

<u>**COUNT II**</u>
**Violation of the Kentucky Uniform Trade Secrets Act (KRS § 365.880, *et seq.*)**
**Against Defendants Shanklin and Washing Systems**

100.    Plaintiff adopts and re-avers the allegations set forth above in each of the preceding paragraphs of the Complaint.

101.    Ecolab developed and Shanklin was privy and given access to certain Ecolab Trade Secret and Confidential Information, as otherwise described herein, including but not limited to

23

individualized customer service information, pricing, business strategies, chemical formulations, dispensing processes, water treatment goals and needs, and technology. Shanklin was also privy to Ecolab's Trade Secret and Confidential Information relating to Ecolab's internal business strategies, marketing information, pricing plans and goals, product formulations, and the development of business strategies and technologies. The forgoing information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

102.    In February and early March 2023, without any business purposes and without Ecolab's consent, Shanklin downloaded certain Trade Secret and Confidential Information from his Ecolab-issued laptop onto a personal USB device. These materials included AUS reports, presentation materials, and account reviews, as well as other proprietary information relating to other accounts, Ecolab's field agent contact information, and Ecolab internal strategic initiatives. Many of the documents downloaded were marked as "CONFIDENTIAL" or had other indicia of their restricted use. The documents and information downloaded constituted Ecolab's Trade Secret and Confidential Information.

103.    The information, documents, and materials stolen and misappropriated by Defendant Shanklin constitute trade secrets within the meaning of, and subject to protection under, the Kentucky Uniform Trade Secrets Act ("KUTSA"), KRS § 365.880, *et seq*.

104.    Ecolab regularly transacts business throughout the United States (including Kentucky), including in person and by phone, internet, and mail, and their trade secrets relate to this business and are used in interstate commerce.

105.    Shanklin acquired Ecolab's trade secrets by improper means, including but not

limited to knowingly accessing, downloading, and using this information in violation of his contractual duties owed to Ecolab.

106.   The information contained in these documents is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. Ecolab has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

107.   Ecolab takes, and at all times here relevant, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include restricting availability of confidential information to key employees, requiring key employees (like Shanklin) to execute agreements with confidentiality provisions and restrictive covenants, physical security measures to protect against the disclosure of sensitive materials to third parties, and IT security efforts, including the Agreement executed by Shanklin in 2019, as well as similar agreements at the commencement of employment and later in his employment with Ecolab.

108.   By accessing Ecolab's computer network without authorization and downloading and retaining its trade secret information after his separation from Ecolab, Shanklin has committed both an actual and threatened misappropriation and misuse of Ecolab's trade secret information in violation of the of the KUTSA.

109.   Upon information and belief, and as Ecolab expects to establish through further investigation and discovery, Shanklin has improperly retained, used, and/or disclosed (and continues to retain, use, and/or disclose) confidential business information and strategies and trade secrets contained in the documents and information he took or disclosed from Ecolab without authorization and in breach of his contractual duties owed to Ecolab in order to compete against Ecolab.

110.    Shanklin engaged in this conduct despite acquiring this information without authorization.

111.    Washing Systems is liable vicariously and under principles of *respondeat superior* for Shanklin's misappropriation, since Shanklin improperly used or disclosed Ecolab's Trade Secret and Confidential Information while working as an employee of Washing Systems and Washing Systems benefitted from his wrongful actions.

112.    As a direct and proximate result of Shanklin's actual and threatened misappropriation of trade secrets which benefitted Shanklin and his subsequent employer Washing Systems, Ecolab has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Shanklin and Washing Systems are enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Ecolab.

113.    To the extent that Shanklin has already provided Ecolab's trade secrets or other confidential information to Washing Systems or third parties, those parties should also be ordered to return and/or destroy that information.

114.    As a direct and proximate result of Shanklin's misappropriation, Ecolab has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the KUTSA. Each of the acts of misappropriation was done willfully and maliciously by Shanklin and Washing Systems to unfairly compete against Ecolab and benefit himself and third parties, thereby entitling Ecolab to exemplary damages to be proved at trial.

FP 46928137.2

**COUNT III**
**Breach of Contract – Employee Agreement**
**(Non-Competition and Non-Solicitation Covenants)**
**Against Defendant Shanklin**

115.    Plaintiff adopts and re-avers the allegations set forth above in each of the preceding paragraphs of the Complaint.

116.    The Agreement is a valid and enforceable contract executed by Shanklin on December 20, 2019.

117.    Shanklin's compliance with the Agreement and the covenants therein were conditions precedent to his employment and continued employment. Shanklin received sufficient consideration to support the contract formation.

118.    The Agreement contains valid and enforceable non-competition and non-solicitation covenants under Kentucky law, which also permits immediate injunctive relief for Shanklin's violations of these provisions.

119.    The Agreement restricts Shanklin's employment with Washing Systems for 18 months to the extent that Shanklin is engaging in any activities involving any Conflicting Product or Services (*e.g.*, detergents, specialty chemicals, injection systems, and water solutions for the commercial laundry processing industry), and to the extent Shanklin is engaging in any services or activities related to Aramark, K-BRO and other Customers of the Company.

120.    Shanklin is engaging in actions in breach of these non-compete and non-solicitation provisions in the Agreement in his position with Washing Systems. Ecolab has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Shanklin is enjoined from engaging in any further acts in violation of these provisions in the Agreement.

27

121.    As a direct and proximate result of Shanklin's breach, Ecolab has suffered and continues to suffer damages, including, but not limited to, the value of its employees' time spent repairing the harm done by the breach, loss of business, loss of good will, increased costs of business, lost profits, loss of corporate opportunity, and the attorneys' fees and costs Ecolab has been forced to incur in connection with this action.

122.    Ecolab is also entitled to all other damages, including its reasonable legal fees, attorneys' fees, and costs in pursuing this injunctive relief and claims for breach of contract.

**COUNT IV**
**Breach of Contract – Employee Agreement**
**(Nondisclosure and Return of Property Covenants)**
**Against Defendant Shanklin**

123.    Plaintiff adopts and re-avers the allegations set forth above in each of the preceding paragraphs of the Complaint.

124.    The Agreement is a valid and enforceable contract executed by Shanklin on December 20, 2019.

125.    Shanklin's compliance with the Agreement and the covenants therein were conditions precedent to his employment or continued employment. Shanklin received sufficient consideration to support the contract formation.

126.    Shanklin breached and is continuing to breach his contractual promise not to, directly or indirectly, misuse or improperly disclose Ecolab's Trade Secrets for so long as such information remains a Trade Secret.

127.    Shanklin breached and is continuing to breach his contractual promise not to, directly or indirectly, misuse or improperly disclose Ecolab's Confidential Information for a period of three (3) years after his voluntary or involuntary termination from employment.

FP 46928137.2

128.    Shanklin breached and is continuing to breach his contractual promise to promptly return all Ecolab property and information, including Trade Secrets and Confidential Information to Ecolab's possession.

129.    Shanklin impermissibly possesses and continues to possess Ecolab's Trade Secret and Confidential Information in furtherance of Shanklin's efforts to unfairly compete. In doing so, Shanklin has violated his obligation to hold this information in a fiduciary capacity and to refrain from using this information except as necessary to perform his duties for the Company or as otherwise authorized by the Company.

130.    Ecolab has already been severely injured by Shanklin's improper and prohibited actions. If Shanklin is not enjoined from continuing to breach his contractual duties, Ecolab will continue to be irreparably injured.

131.    As a result of Shanklin's breach of his contractual obligations, Ecolab has been damaged, and will continue to be damaged, in an amount to be proven at trial.

### COUNT V
### Covenant of Good Faith and Fair Dealing

132.    Plaintiff adopts and re-avers the allegations set forth in each of the preceding paragraphs of the Complaint.

133.    The Agreement executed by Shanklin contains implied duties that Shanklin will act fairly and in good faith towards Ecolab.

134.    Pursuant to the Agreement, Shanklin had a duty not to do anything to prevent Ecolab from receiving the benefits of this Agreement.

135.    Through the actions as set forth in this Complaint, Shanklin has breached this duty of good faith and fair dealing owed to Ecolab.

136.    As a result of Shanklin's breach of the covenant of good faith and fair dealing owed to Ecolab, Ecolab has been damaged, and continues to be damaged, in an amount to be proven at trial.

**COUNT VI**
**Tortious Interference**
**(Against Defendant Washing Systems)**

137.    Plaintiff adopts and re-avers the allegations set forth above in each of the preceding paragraphs of the Complaint.

138.    The Agreement is a valid and enforceable contract executed by Shanklin on December 20, 2019.

139.    The Agreement contains valid and enforceable non-competition and non-solicitation covenants under Kentucky law, which also permits immediate injunctive relief for Shanklin's violations of these provisions.

140.    The Agreement restricts Shanklin's employment with Washing Systems for 18 months to the extent that Shanklin is engaging in any activities involving any Conflicting Product or Services (*e.g.*, detergents, specialty chemicals, injection systems, and water solutions for the commercial laundry processing industry), and to the extent Shanklin is engaging in any services or activities related to Aramark and other Customers.

141.    The Agreement required Shanklin to provide a copy of the Agreement to any subsequent employer.

142.    By hiring and continuing to employ Shanklin as indicated herein, Washing Systems, despite having knowledge of the Agreement, intentionally and wrongfully interfered with Ecolab's contractual covenants with Shanklin and induced Shanklin to breach the Agreement with Ecolab.

30

143.    Washing Systems had no justification for its intentional interference with the Agreement, and its actions were undertaken with the intent of harming Ecolab's contractual and business relationships.

144.    By engaging in the conduct described, Washing Systems has tortiously, intentionally, and willfully interfered with Ecolab's contractual relationship with Shanklin for its own benefit, without right or justification, and at the expense of Ecolab.

145.    As a direct and proximate result of the actions of Washing Systems, Ecolab has suffered irreparable harm and will continue to suffer irreparable harm, including damage to the reputation and goodwill, that cannot be adequately remedied at law unless Washing Systems is enjoined from engaging in any further acts in violation of these provisions in the Agreement.

146.    As a direct and proximate result of Shanklin's breach, Ecolab has suffered and continues to suffer damages, including, but not limited to, the value of its employees' time spent repairing the harm done by the breach, loss of business, loss of good will, increased costs of business, lost profits, loss of corporate opportunity, and the attorneys' fees and costs Ecolab has been forced to incur in connection with this action.

147.    Washing System's conduct was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Ecolab, entitling Ecolab to an award of punitive damages.

148.    Ecolab is also entitled to all other damages, including its reasonable legal fees, attorneys' fees, and costs in pursuing this injunctive relief and claims for breach of contract.

## JURY DEMAND

Ecolab respectfully demands a trial by jury on all counts.

FP 46928137.2

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts complained of, Ecolab respectfully requests that this Honorable Court enter one or more orders granting it the following relief:

A.    A temporary restraining order, preliminary injunction, and a permanent injunction requiring Shanklin and Washing Systems (and any persons acting in concert with them or on their behalf) as follows:

1)   Shanklin, Washing Systems and their respective agents, servants, employees, representatives, and attorneys, and other persons who are in active concert or participation with any of the foregoing (collectively, "Covered Persons") are ordered, restrained and enjoined as follows:

   i.    Directly or indirectly, disclosing or making any use of any Trade Secret and Confidential Information of Ecolab;

   ii.   Provide a full and complete accounting of all electronic devices, email accounts, cloud-storage accounts, and other devices/accounts that Shanklin had access to and that any of the information that Shanklin improperly downloaded and copied may have been downloaded to or accessed as stated in the Complaint;

   iii.  Take all necessary steps to maintain and preserve all potentially relevant evidence regarding the allegations in the Complaint, including, but not limited to, all indicia and potential evidence relating to Shanklin's misappropriation of Ecolab's trade secrets and confidential/proprietary information and his and others potential access of that same information by any and all electronic devices, email accounts, including internet e-

32

mail accounts, cloud-storage based accounts, and the like within its possession, custody or control;

iv.   Make available for inspection and imaging all computers, external storage devices, mobile devices, and all personal Cloud and email accounts including internet-based e-mail accounts in Shanklin's possession and/or control, to determine the full extent of Shanklin's access, possession, retention, and use of Ecolab's confidential information or trade secrets.

2)   The Covered Persons return to Ecolab any Trade Secret and Confidential Information that is in their possession, custody, or control (including but not limited to Trade Secret and Confidential Information in paper form and in electronic form, wherever and however stored, including but not limited to personal computers, cloud storage, external storage media, smart phones and other handheld devices, and email accounts) and to the extent that any such information is maintained in electronic form;

3)   Until further Order of the Court, the Covered Persons are restrained from conducting, carrying on, or engaging in any competitive business that was developed and/or implemented, in whole or in part, directly or indirectly, through the use of any Ecolab Trade Secret and Confidential Information; and

4)   For an order enjoining and prohibiting Shanklin (and all those acting in concert with him) from engaging, directly or indirectly, in any business activities individually or through his employment with Washing Systems for 18 months to the extent that Shanklin is engaging in any activities involving any

33

Conflicting Product or Services (*e.g.*, detergents, specialty chemicals, injection systems, and water solutions for the commercial laundry processing industry).

5) For an order enjoining and prohibiting Shanklin (and all those acting in concert with him) from engaging in providing services or activities, including soliciting, directly or indirectly, with any current, former or prospective Ecolab Customer, including, but not limited to Aramark, for a period of eighteen (18) months following the date of the court's order; and

6) For an order enjoining and prohibiting Washing Systems (and all those acting in concert with it) from employing Shanklin in a manner that would violate the non-competition and non-solicitation and non-disclosure covenants contained in the Agreement for a period of eighteen (18) months following the date of the court's order;

B.      Judgment in favor of Ecolab and against Defendant;

C.      An award to Ecolab of actual damages (such as lost profits) and disgorgement of amounts by which Defendants have been unjustly enriched, or in the alternative, a reasonable royalty;

D.      An award to Ecolab of punitive and/or exemplary damages;

E.      An award to Ecolab of its reasonable attorneys' fees and its costs incurred in this action;

F.      An award to Ecolab of pre-judgment and post-judgment interest; and

G.      Such other and further relief as this Court deems just and proper

Respectfully submitted,

*/s/ Craig P. Siegenthaler*

Craig P. Siegenthaler
**FISHER & PHILLIPS LLP**
220 West Main Street, Suite 1700
Louisville, Kentucky 40202
Telephone: (502) 561-3990
Fax: (502) 561-3991
csiegenthaler@fisherphillips.com

Kris Leonhardt (*Admission pending*)
KY Bar No. 93522
**FISHER & PHILLIPS LLP**
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
Telephone: (602) 281-3400
Fax: (602) 281-3401
kleonhardt@fisherphillips.com


COUNSEL FOR PLAINTIFF

FP 46928137.2

## <u>VERIFICATION</u>

I, Thomas Harrington, Assistant Vice President Corporate Accounts, Textile Care, of Ecolab, Inc., hereby state that I have read the foregoing VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES, and that I know the factual allegations set forth herein in paragraphs 1 to 148 to be true based on personal knowledge, or on information available to me which I believe to be true to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of April, 2023.


_____        _____
                                     Thomas Harrington

FP 46928137.2