LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## ─COURT REPORTERS─



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF KENTUCKY

3      CIVIL ACTION NO. 3:23-CV-215-CHB-RSE

4

5               ECOLAB INC.,

6                 Plaintiff

7

8                    V.

9

10      JOHN SCOTT SHANKLIN, ET AL.,

11               Defendants

12

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  RUSSELL BERMAN ON BEHALF OF ECOLAB INC.

24   DATE:      JANUARY 5, 2024

25   REPORTER:  HANNAH BRANDENSTEIN

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                      Page 2
1                 APPEARANCES
2
3   ON BEHALF OF THE COUNTERCLAIM PLAINTIFF, WASHING
4   SYSTEMS, LLC:
5   Jeremy S. Rogers, Esquire
6   Sarah D. Reddick, Esquire
7   Suzanne M. Marino, Esquire
8   Dinsmore & Shohl LLP
9   101 South Fifth Street
10  Suite 2500
11  Louisville, Kentucky 40202
12  Telephone No.: (502) 581-8000
13  E-mail: jeremy.rogers@dinsmore.com
14         sarah.reddick@dinsmore.com
15         suzanne.marino@dinsmore.com
16  (Appeared Via Videoconference)
17
18
19
20
21
22
23
24
25
```

```
                                      Page 3
1            APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE COUNTERCLAIM DEFENDANT, ECOLAB INC.:
4   Matthew Kilby, Esquire
5   Faegre Drinker Biddler & Reath LLP
6   2200 Wells Fargo Center
7   90 South Seventh Street
8   Minneapolis, Minnesota 55402
9   Telephone No.: (612) 766-7232
10  E-mail: matthew.kilby@faegerdrinker.com
11  (Appeared Via Videoconference)
12
13  ON BEHALF OF THE COUNTERCLAIM DEFENDANT, ECOLAB INC.:
14  Kate Middleton, Esquire
15  In-House Counsel for Ecolab Inc.
16  12 Seventh Street West
17  St. Paul Minnesota 55102
18  (Appeared Via Videoconference)
19
20  Also Present: John Scott Shanklin, Defendant; Bruce
21  Duron, WSI Representative
22
23
24
25
```

```
                                      Page 4
1                    INDEX
2                                          Page
3   PROCEEDINGS                             6
4   DIRECT EXAMINATION BY MR. ROGERS        7
5
6
7                   EXHIBITS
8   Exhibit                                 Page
9   1 - Bates Stamp Number ECOLAB1086       34
10  2 - Bates Stamp Number ECOLAB001085     56
11  3 - Bates Stamp Number ECOLAB001088     64
12  4 - Bates Stamp Number ECOLAB1224       75
13  5 - Bates Stamp Number ECOLAB001226     76
14  6 - Bates Stamp Number ECOLAB001237     82
15  7 - Bates Stamp Number ECOLAB001242     83
16  8 - Bates Stamp Number ECOLAB001090     87
17
18
19
20
21
22
23
24
25
```

```
                                      Page 5
1                  STIPULATION
2
3   The 30(B)(6) deposition of RUSSELL BERMAN was taken at
4   KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE
5   101, LOUISVILLE, KENTUCKY 40202, via videoconference in
6   which all participants attended remotely, on FRIDAY, the
7   5TH day of JANUARY 2024 at 9:07 a.m. (ET); said 30(B)(6)
8   deposition was taken pursuant to the FEDERAL Rules of
9   Civil Procedure.  The oath in this matter was sworn
10  remotely pursuant to FRCP
11  30.
12
13  It is agreed that HANNAH BRANDENSTEIN, being a Notary
14  Public and Court Reporter for the State of INDIANA, may
15  swear the witness.
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1       PROCEEDINGS
2
3       THE REPORTER:  Okay.  We are on record.  Will
4   all parties except for the witness please state
5   your appearance, how you are attending, and your
6   location?
7       MR. ROGERS:  I'll start.  This is Jeremy
8   Rogers at Dinsmore & Shohl in Louisville, counsel
9   for Washing Systems and the other defendants in the
10  lawsuit.  Here in the conference room with me are
11  co-counsel Sarah Reddick, Suzanne Marino, and then
12  defendant, John Scott Shanklin.  And then I believe
13  also on another link is WSI's representative for
14  today, Bruce Duron.  He may -- we may need to --
15  for him to just confirm that he's on.
16      MR. DURON:  I'm on.
17      MR. ROGERS:  Thanks.  That's everybody from
18  the WSI team.
19      MR. KILBY:  And on the Ecolab side, this is
20  Matt Kilby from the Faegre Drinker firm, and Kate
21  Middleton, who is in-house Counsel for Ecolab.  And
22  we are located in a conference room of an Embassy
23  Suites in the Greater Tampa area.
24      THE REPORTER:  All right.  Thank you.
25  Mr. Berman, will you please state your full name

Page 7

1   for the record?
2       THE WITNESS:  Russell Sean Berman.
3       THE REPORTER:  And please hold your ID up to
4   the camera.  All right.  Perfect.  Thank you.  Do
5   all parties agree the witness is Mr. Berman?
6       MR. ROGERS:  Yes.
7       MR. KILBY:  Yes.
8       THE REPORTER:  All right.  Thank you.  And
9   Mr. Berman, will you please raise your right hand?
10  Do you solemnly swear or affirm that the testimony
11  you're about to give will be the truth, the whole
12  truth, and nothing but the truth?
13      THE WITNESS:  Yes.
14      THE REPORTER:  All right.  Thank you.  Counsel,
15  you may begin.
16          DIRECT EXAMINATION
17  BY MR. ROGERS:
18      Q.  Morning, Mr. Berman.  My name is Jeremy
19  Rogers.  I represent Washing Systems in this case.
20  You've been designated as a corporate representative by
21  Ecolab, Inc. to testify about certain topics today.  Is
22  that your understanding?
23      A.  Yes.
24      Q.  Have you given a deposition before?
25      A.  No.

Page 8

1       Q.  Okay.  Well, I'm sure your counsel has told
2   you-all about this, but just so that we're clear, this
3   is -- you're under oath, this is my opportunity to ask
4   you questions as a representative of Ecolab, to answer
5   on behalf of the company on those topics.  We have a
6   court reporter writing down my questions and your
7   answers, so it's a little bit different than a normal
8   conversation.  So if you would work with me and try not
9   to speak over me, I'll do the same and try not to speak
10  over you so that we can get a clean transcript.  Does
11  that sound fair?
12      A.  It does.  Thank you.
13      Q.  And in a normal conversation, we may say uh-
14  huh or uh-uh or nod a -- nod your head or shake your
15  head, and that's perfectly normal, but that can't be
16  transcribed so easily.  So if you do that and I say, is
17  that a yes or is that a no, the reason is just to get a
18  clean transcript, not to be cute or anything else.  Does
19  that work for you?
20      A.  It does.  Thank you.
21      Q.  You were provided a link to some documents
22  this morning; is that correct?  From our firm?
23      A.  Just recently.  They came from Kate.  I have
24  not reviewed them.
25      Q.  Okay.  Are you able to pull those up on your

Page 9

1   computer?  You don't have to do so right now, but when
2   we start talking about documents, I want to make sure
3   you're able to do that so that if we need to correct the
4   technology, we can do that in the meantime.
5       A.  I did.  I was able to access one of the
6   documents, so my assumption is that I will be able to
7   access the -- the -- the group, yes.
8       Q.  Very good.  Have you had a chance to review
9   the notice to take corporate representative deposition
10  of counterclaim Defendant Ecolab, Inc., that lists the
11  topics you've been designated to testify about?
12      A.  Yes, but just recently.
13      Q.  Yes.  And I don't want know about the
14  substance of communications you've had with the
15  attorneys who represent Ecolab here, but without getting
16  into that substance, can you tell me what you've done to
17  prepare for the deposition today?
18      A.  There have been some meetings between myself
19  and Counsel, particularly Matt and Kate.  And then
20  yesterday we met in the conference room that Matt had
21  stated, to review the documents or the -- the document
22  that you had in question and prepare for today's
23  deposition.
24      Q.  Okay.  And when you say Matt and Kate, you're
25  referring to Matthew Kilby and Kate Middleton?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    A.   Correct.  There was an additional Matt, like,
2  Burkhart or something of that form, on some of the
3  previous conversations, but yes.
4    Q.   Okay.  Thank you for that clarification.  Did
5  you review any documents other than the deposition
6  notice to prepare for today?
7    A.   Yes.  There was a list of -- of associates --
8  Ecolab associates that were present during two
9  particular weeks that I was provided and reviewed.  And
10  there was a secondary document.  I'm -- I'm -- I cannot
11  recall the name of it, but it -- it had responses to --
12  to questions.
13    Q.   So could -- would it have been answers to
14  interrogatories?
15    A.   Yes.  Interrogatories is the word, yes.
16    Q.   Okay.  We -- and we may talk about that in
17  more detail later.  Well, I'm going to jump right into
18  the first subject of testimony, and that is all
19  communications between Ecolab and Cintas pertaining to
20  Ecolab's pilot program at Cintas' Denver plant and
21  concerning the ability or inability to access Washing
22  Systems' desktop or any information contained therein.
23  That topic sound familiar in terms of the topics that
24  you remember looking at to prepare for today?
25    A.   Yeah, it was in the notice.  Correct.

Page 11

1    Q.   Okay.  So just to jump right into that, what
2  information do you have about the desktop computer at
3  that Denver plant and what may have been said or told to
4  anyone from Ecolab by anyone from Cintas about that
5  computer?  In other words, there's a computer there,
6  don't touch it.  There's a computer there, you're free
7  to touch it, et cetera.  Does that make sense?
8    A.   It does, but there are -- there are lots of
9  questions there that I'd -- I'd guess I'd ask you to
10  unpack one individually, you know, one by one, if that's
11  acceptable.
12    Q.   Yes.  What -- what's the -- chronologically,
13  what's the first communication between Cintas and Ecolab
14  of which you are aware, that concerned whether and to
15  what extent Ecolab could access information at the
16  Denver plant?
17    A.   Cintas had spoken to me about not accessing
18  WSI's property.  I would define WSI's property as their
19  -- their dispenser, their computer, and their chemistry.
20    Q.   Okay.  You say Cintas talked to you about
21  that.  Was there -- what -- do you recall what human
22  being from Cintas had those communications with you?
23    A.   A gentleman named Pat Kneip.
24    Q.   Are you able to spell or approximate the
25  spelling of that last name?

Page 12

1    A.   K-N-E-I-P.
2    Q.   Thank you.  Do you know Mr. Kneip's position
3  or title with Cintas?
4    A.   I don't -- I don't know if I recall it
5  specifically, but in general terms, he's the director of
6  chemical and environmental engineering for Cintas.
7    Q.   He is -- if I understand correctly, he is not
8  particular to the Denver plant, but he is a Cintas
9  person from what, corporate headquarters or from
10  somewhere else --
11    A.   Are you asking, like, what is his role?  I'm
12  sorry.  I stepped over you.  Go ahead.
13    Q.   Yeah.  No, it's fine.  You're not -- it was
14  not -- it's not a perfect question.  Trying to figure
15  out if Mr. Kneip is local in Denver or not?
16    A.   Local as in does he work at that facility?
17    Q.   Correct.
18    A.   No, he does not.  He works at the corporate
19  office in Milford.
20    Q.   Thank you.  When was this communication
21  between yourself and Mr. Kneip, the first communication
22  of what you recall about this --
23    A.   I don't recall the exact dates, but it was
24  when Ecolab was given the opportunity to conduct trials,
25  Mr. Kneip provided that information.

Page 13

1    Q.   Would this have been prior to June 2023?
2    A.   Yes.
3    Q.   Would it have been in calendar year 2023?
4    A.   Yes.
5    Q.   So sometime between January 1st, 2023 and the
6  end of May 2023?
7    A.   The end --
8        MR. KILBY:  Objection.  Form.  You can go
9  ahead and answer it.
10        THE WITNESS:  The end of May 2023?  Yes, it
11  would have occurred in that timeframe, but
12  Mr. Kneip -- I can't recall exactly, but during the
13  beginnings of each trial, he reiterated similar
14  points.
15  BY MR. ROGERS:
16    Q.   Okay.  So this communication concerned not
17  only the Denver plant, but other plants that Ecolab was
18  going to pilot with Cintas; is that true?
19    A.   Yes.
20    Q.   Was this communication -- well, let me ask it
21  this way.  In what format was the communication between
22  Mr. Kneip and yourself?  Telephone, in person, et
23  cetera?
24    A.   I can't recall, but I -- what I do recollect
25  what it -- it was -- it would have been in person.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    Q.   Are you aware of any written communication
2    from Mr. Kneip to yourself or anyone else at Ecolab that
3    pertained to accessing or not accessing Washing Systems'
4    information or property for these pilot projects?
5    A.   I don't recall any written communication, no.
6    Q.   Is there anything else that you remember about
7    this initial communication with Mr. Kneip that we
8    haven't talked about already this morning?
9    A.   As it pertains to accessing or not touching
10   WSI's property?
11   Q.   Anything about the communication?
12   A.   Well, I -- I -- I'd say it was brief, and I
13   understood the communication that he -- he was saying,
14   and I accepted that.
15   Q.   Okay.  Did you share that information about
16   what Mr. Kneip had told you with others in Ecolab, if
17   you recall?
18   A.   I do recall, yes.  And yes, I did share that
19   information with other members within Ecolab.
20   Q.   Do you recall which other Ecolab employees you
21   may have shared that information with?
22   A.   In totality?
23   Q.   The -- as the best you can remember.
24   A.   I --
25   Q.   I realize --

Page 15

1    A.   -- would have -- yeah.  Go ahead, sir.
2    Q.   I just -- I'm sorry to interrupt.  I just said
3    I realize you may not be able to give an exhaustive
4    list, but just to the best of your recollection.
5    A.   I would have -- I did provide that information
6    to each member of every trial, and I likely provided
7    similar information to members of Ecolab that were
8    involved in the -- the trial, but may not have had
9    direct participation in any of the trials on -- on site
10   at any of the Cintas facility.
11   Q.   Would that have been communication that you
12   provided to Ecolab employees shortly before they would
13   go to the particular sites as a regular matter of
14   course?
15         MR. KILBY:  Objection --
16         THE WITNESS:  Yes --
17         MR. KILBY:  Objection.  Form.  Go ahead.
18         THE WITNESS:  Yes.  I would have provided that
19   information to associates participating in the
20   trials in -- in preparation for the trials, but
21   also prior to the -- the actual physical work being
22   conducted at the trial.
23   BY MR. ROGERS:
24   Q.   Are you aware of any writing in which you or
25   anyone else informed Ecolab employees not to access

Page 16

1    Washing Systems' information along the lines
2    that we've discussed?  I think I wrote down dispenser,
3    computer, chemistry.  I guess the gist of my question
4    is:  Was there an e-mail or anything else in writing that
5    pertained to that internally at Ecolab?
6    A.   As it pertains directly to Denver?
7    Q.   We'll start with Denver, sure.
8    A.   Not that I recall.
9    Q.   As it pertains to any other Cintas pilot --
10   A.   I do -- I do believe I -- I did state those
11   things to a gentleman named Clay Lafrenz as it pertains
12   to the trial at the St. Pete facility.
13   Q.   My question was if there was anything in
14   writing that you recall.  You said you stated that to
15   Clay Lafrenz.  Do you believe that was in an e-mail or
16   some other written communication?
17   A.   Yes.  Correct.
18   Q.   An e-mail?
19   A.   I can't recall whether it was an e-mail or a
20   text.  Sometimes the associates use different forms of
21   written communication.  But I do recall having some form
22   of communication in the written form to Mr. Lafrenz.
23   Q.   Okay.  For the benefit of our court reporter,
24   can you help us, if you're able, to spell the last name
25   of Mr. -- I guess it's Mr. Lafrenz?

Page 17

1    A.   L-A-F-R-A -- F-R-A-N-Z [sic], maybe.  Z-E,
2    something like that.  Clayton is his first name.  He
3    just goes by Clay.
4    Q.   Thank you.  Do you know an approximate
5    timeframe when you would have sent such a written
6    communications to Mr. Lafrenz?
7    A.   The actual date, no.  But it would have been
8    the week -- sometime during the week prior to the -- the
9    actual physical trial, like, the start of the trial at
10   St. Pete.
11   Q.   Do you know when that trial at St. Pete began?
12   A.   Off the top of my head, no, but I -- I can
13   look through my notes if -- or my -- my outlook if you
14   would like the specific date.
15   Q.   That's not necessary for present purposes.
16   Tell me this if you know.  Was the St. Pete pilot
17   started prior to the Denver pilot?
18   A.   Chronologically, no.  It -- it came
19   afterwards.
20   Q.   Aside from the written communication that you
21   recall to Mr. Lafrenz, are you aware of any other
22   written communication internally in Ecolab that pertains
23   to the topic of accessing or not accessing Washing
24   Systems' property or information in these pilot projects
25   with Cintas?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    A.   Could you clarify, I guess, in a little more
2  detail the nature of your question?  I -- I -- it was
3  rather broad.
4    Q.   Yeah.  And it was verbose, so I apologize for
5  that.  I -- what I'm really trying to get at, to speak
6  plainly, is are there any other e-mails or texts that
7  you're aware of where you or anybody else at Ecolab said
8  to the Ecolab field teams or others, hey, you folks are
9  going to be going to Denver or St. Pete or Everett,
10  wherever the pilot projects is going to happen.  Please
11  make sure you're not trying to gain access to Washing
12  Systems' computer or Washing Systems' chemistry or their
13  dispenser, that sort of a thing?  Just trying to make
14  sure that I understand what other written communications
15  there might be besides the one that we talked about.
16    A.   I --
17    MR. KILBY:  Objection.  Form.  And objection
18  beyond the scope of topic one.  So he can testify,
19  but it's whatever he recalls personally.
20    THE WITNESS:  I do not recall any other
21  written communication around said topic outside of
22  that of St. Pete.
23  BY MR. ROGERS:
24    Q.   Okay.  We talked earlier about the -- I think
25  what you indicated was an oral conversation between

Page 19

1  yourself and Mr. Kneip.  I may need to mispronounce that
2  name.  Are you aware of any other oral or written
3  communication between Ecolab and Cintas about the topic
4  of Washing Systems' information or property being
5  accessed or not accessed in connection with the pilot
6  projects?
7    A.   Not in written form, no.  In verbal form,
8  Mr. Kohler, Stephen Kohler, and I likely had
9  communication around the same.
10    Q.   Okay.  Let's start with spelling.  Is it
11  Stephen with a P-H or a V, if you know?
12    A.   P-H.
13    Q.   And Kohler, would that be, K-O-H-L-E-R?
14    A.   Yes, I believe so.
15    Q.   Mr. Kohler -- do you know what Mr. Kohler's
16  role or title is with Cintas?
17    A.   I don't recall the exact title, but he -- he
18  works for Mr. -- for Pat.  He's a member of the chemical
19  environmental engineering team, so I'm -- my assumption,
20  without looking at his e-mail or card, would be that he
21  was an -- an engineer on said team.
22    Q.   Okay.  And what do you recall about the
23  communication with Mr. Kohler?
24    A.   That in -- it would be -- it would have had
25  been in similar nature, so I don't recall the -- the

Page 20

1  specific communication, but general -- in general terms,
2  it would have been around what I had mentioned to you
3  that Pat Kneip had described, that it -- it is Cintas'
4  direction not to touch WSI's property.  And that again,
5  would have been the dispensers, the computer, and the
6  chemistry.
7    Q.   And this was -- was this communication in
8  connection with any particular location, or was it
9  general to all pilot projects, if you know?
10    A.   I -- I -- I don't recall specifically, but my
11  understanding is that it was the latter.  It would --
12  would -- it would have pertained to all of the trials.
13    Q.   So aside from the sort of general instruction
14  not to touch or access the dispenser, computer, or
15  chemistry, are you aware of any other detail from any of
16  these communications from Cintas?
17    A.   Not explicitly, no.
18    Q.   Okay.  Do you know if there was ever a mention
19  of a contractual agreement that Cintas was a party to
20  prohibiting it from allowing such information to be
21  accessed by others?
22    A.   I am --
23    MR. KILBY:  Objection to form.
24    THE WITNESS:  I am aware that Cintas and WSI
25  have a contract in place.  What is -- what the

Page 21

1  nature of that contract states, I have absolutely
2  no idea.
3  BY MR. ROGERS:
4    Q.   I want to move on to the second topic for now,
5  and that is all steps taken by Ecolab to access any
6  information from the Washing Systems' desktop, which
7  parenthetically is the desktop computer at the Denver
8  Cintas plant, including the identities and locations of
9  every storage device, software program, account and/or
10  data system where any such information has been directly
11  or indirectly accessed, copied, transfer -- I'm sorry,
12  transferred, stored, or otherwise saved.  I just
13  attempted to read topic number two.  Does that generally
14  conform with your recollection of one of the topics in
15  the deposition notice that you've reviewed?
16    A.   Yes.
17    Q.   So what is the earliest step of which you're
18  aware of anyone associated with Ecolab attempting to
19  gain access to the desktop computer in Denver?
20    A.   The earliest, is -- is that what you said?
21    Q.   Yes, sir.
22    A.   My understanding, in speaking with Mr. Vesely,
23  was that he accessed the computer at the Denver
24  facility, that the Softrol computer at the Denver
25  facility, the Thursday of the -- what we call the survey

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1 week.
2      Q.   Okay.  Would that have been Thursday,
3 June 22nd, 2023?
4      A.   I believe so, yes.
5      Q.   Okay.  You just mentioned that you learned of
6 this from Mr. Vesely.  Did you learn of this from
7 Mr. Vesely around the time that it occurred, or more
8 recently in connection with preparation for this
9 deposition, or it would have been --
10      A.   Or -- yeah.  Go ahead.  Sorry.
11      Q.   Or otherwise, I guess.  It didn't have to be
12 limited in those two.
13      A.   Yeah, it would have been otherwise.  So
14 Counsel started conducting an investigation.  They
15 started with Mr. Vesely.  I was part of that discussion,
16 and I learned upon -- I learned at the -- Mr. Vesely did
17 say that he did, in fact, access the computer on said
18 date.
19      Q.   Okay.  Are you aware of anyone else from
20 Ecolab directly accessing the Denver desktop computer?
21      A.   Physically accessing the Denver desktop
22 computer?
23      Q.   Correct.
24      A.   No, I am not aware.
25      Q.   Okay.  And you clarified physically.  Are you

Page 23

1 aware of anyone from Ecolab accessing that desktop
2 computer other than physically?
3           MR. KILBY:  Objection.  Vague.
4           THE WITNESS:  Yeah.  I -- I'd ask you to
5      define what -- what that would mean, right?  So can
6      you elaborate a bit on -- on your question?
7 BY MR. ROGERS:
8      Q.   Well, you -- you -- you raised the word
9 physically in response to my question, and that just
10 leads me to ask, is there some way to access the desktop
11 other than physically?  And I suppose one might be
12 remote access through some sort of a remote connection.
13 I don't know what -- you raised the term physically.  I
14 just want to know, other than physically, if you're
15 aware of anybody accessing that desktop --
16      A.   Accessing -- yeah.  Accessing the computer
17 physically, what I meant is physically sat down in front
18 of the computer and started typing or -- used a mouse
19 and -- and accessed the computer.  So that -- that is
20 what I -- my question was around physically.  And -- and
21 my understanding of that is no, only Mr. Vesely had
22 physical access to the computer.  Am I aware of any
23 other access, like did somebody remote in to access the
24 computer?  I am not.
25      Q.   Okay.  Are you able to access the documents

Page 24

1 now?  And particularly I'm going to look at the document
2 that's Bates labeled Ecolab 1086.  I believe the link
3 should have the documents organized by that, by those
4 Bates number names.  It's 108.
5      A.   Yeah, I'm checking.  Yes, I can.
6      Q.   Okay.  Do you -- you have that document in
7 front of you?
8      A.   If the document in question is an e-mail from
9 Mr. Vesely to Mr. Wilhoit, then yes, I do.
10      Q.   Okay.  Scroll down --
11           MR. KILBY:  Give me a second, Counsel.  I'm --
12           MR. ROGERS:  -- to the bottom of that
13      document --
14           MR. KILBY:  Give me a second, Counsel.  I'm
15      still opening it here.
16           MR. ROGERS:  Oh, I'm sorry, Matt.
17           MR. KILBY:  No problem.  It's just taking a --
18      it's taking a second to -- oh, I must have --
19           MR. ROGERS:  I was just going to ask
20      Mr. Berman to --
21           MR. KILBY:  I think I --
22           MR. ROGERS:  -- to scroll down to the bottom
23      to verify that it has that Bates number at the
24      bottom, Ecolab 1086 --
25           MR. KILBY:  Yeah, he can do that while I'm

Page 25

1      pulling it up.
2           THE WITNESS:  Yeah.  At the bottom, it says,
3      "Ecolab 001086."
4 BY MR. ROGERS:
5      Q.   Yes, sir.  Thank you.
6      A.   You're welcome.
7           MR. ROGERS:  Matt, just let us know when
8      you're with us, and we'll --
9           MR. KILBY:  Yeah.  Sorry.  It had timed me out
10      of your system.  Okay.  I've got it up.  Go ahead.
11           MR. ROGERS:  All right.  Refilling my coffee
12      cup here.
13 BY MR. ROGERS:
14      Q.   That document has two e-mails.  It's an e-mail
15 chain, in other words, correct?
16      A.   Yeah.  There are two -- it looks like two e-
17 mails.  Yes.  One from Mr. Wilhoit and then a response
18 from Mr. Vesely.
19      Q.   Okay.  Mr. Wilhoit has his, I guess, contact
20 information and title down at the bottom.  Can you tell
21 me just in, I guess, general terms what Mr. Wilhoit's
22 role is at Ecolab?
23      A.   It -- it is the same role of that of
24 Mr. Vesely, except for it's specialized to a particular
25 customer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    Q.   Okay.  And that particular customer, in
2    Mr. Wilhoit's case, would be Aramark?
3    A.   Correct.
4    Q.   Okay.  Did Mr. Wilhoit have a particular role
5    for Ecolab in connection with the Denver Cintas' pilot?
6    A.   A particular role?  Can you expand on that?
7    Q.   Yes.  I guess what I'm driving at is it sounds
8    like there may have been a team that was dedicated to
9    the Denver plant pilot, and I wonder if Mr. Wilhoit was
10   on that team or if he had some assignment specific to
11   the Denver pilot for Cintas.  Does that make sense?
12   A.   It does.  Thank you for clarification.  No, he
13   -- he was not assigned to the Denver trial team.
14   Q.   Okay.  It appears that he sent an e-mail to
15   Mr. Vesely on June 22nd, 2023 with the subject line,
16   "Softrol."  Do you see that?
17   A.   Yes.
18   Q.   But there's nothing in the text of the e-mail
19   other than Mr. Wilhoit's -- what appears to be
20   Mr. Wilhoit's automatically generated contact
21   information and title that we see in e-mail sometimes.
22   Does that sound accurate to you, based on your review of
23   this document?
24        MR. KILBY:  Objection.  Form.
25        THE WITNESS:  What you stated, that there is

Page 27

1    an e-mail from Mr. Wilhoit that has a subject line
2    that says, "Softrol" with nothing else in the body
3    of the e- mail with Mr. Wilhoit's self -- or
4    automatically generated signature line?  Yes, I --
5    I agree that's accurate.
6    BY MR. ROGERS:
7    Q.   Okay.  Do you know whether that e-mail from
8    Mr. Wilhoit to Mr. Vesely had a -- an attachment to it?
9    A.   No, I do not.
10   Q.   You can't say whether it did or didn't.  You
11   just don't know.  Is that fair to say?
12   A.   Correct.
13   Q.   Okay.  Do you know what Softrol is?
14   A.   It's a company.
15   Q.   Okay.  Does that company provide software that
16   is used by Washing Systems or other companies to run
17   chemistry into industrial laundry machines?
18   A.   Generally speaking, yes.  You -- you -- what
19   you have said is accurate.
20   Q.   Okay.  And it appears, in response to that e-
21   mail from Mr. Wilhoit to Mr. Vesely, Mr. Vesely responds
22   on June 23rd, '23 at 3:25 a.m.  It says, "Tom, thank
23   you.  Still haven't had luck getting my cable to work
24   but was at least able to save a site backup to my laptop
25   using 'backdoor' directions.  Thank you for your help,

Page 28

1    as always.  Sincerely, Adam."  Did I read that
2    correctly?
3    A.   Yes.
4    Q.   Do you know what backdoor directions are
5    referenced in this e-mail?
6    A.   Yes.
7    Q.   Okay.  Can you tell me your understanding of
8    what those backdoor directions are, that are referenced
9    in the e-mail, please?
10   A.   Yes.  During a conversation with Mr. Vesely,
11   he stated that -- well, I asked him specifically, how
12   did he get access to the Softrol computer, understanding
13   that he did not have a username and password.  And he
14   said that he reached out to members of the Aramark team,
15   in this case Mr. Wilhoit, to determine if there is a way
16   to get into the Softrol software in a form that didn't
17   require a username or password.
18   Q.   Okay.  And do you know what the response or
19   answer to that inquiry was?
20   A.   According to Mr. Vesely, there is a "backdoor
21   way," but I do not recall or I don't know if Mr. Vesely
22   actually said what they were or how to do it, but he did
23   say, in fact, that there was a -- a mechanism to do so
24   and that he used that mechanism to access the software.
25   Q.   Do you know why it was that Mr. Vesely was

Page 29

1    attempting this backdoor access to the Softrol
2    information?
3    A.   I know what Mr. Vesely said during his
4    interview, yes.
5    Q.   Okay.  And what was that?
6    A.   That he had tried to establish communication
7    with a washing machine, an Ellis washing machine, that
8    had a Softrol controller and was unable to do so.  So he
9    asked the Cintas Denver plant manager, I believe his
10   name's Derek Colwell, whether or not he could, in fact,
11   have access to that computer to work on establishing
12   communication with that washer.
13   Q.   Okay.  You mentioned someone from Cintas,
14   Derek -- I think you said Colwell?
15   A.   Correct.
16   Q.   Can you help us with the spelling of that name
17   please, to the extent you're able?
18   A.   Yeah, I -- I believe it's C-O-L-L-W-E-L-L
19   [sic].
20   Q.   And Mr. Colwell is, or was at that time, an
21   employee of Cintas.  Is that your understanding?
22   A.   Was and currently is an employee of Cintas at
23   the Denver facility, yes.
24   Q.   Okay.  Do you know what Mr. Colwell's role at
25   the Cintas Denver plant is?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    A.   Yes, he is the plant manager.

2    Q.   And do you know what the result of the -- that

3 discussion between Mr. Vesely and Mr. Colwell was in

4 terms of the -- accessing the computer?

5    A.   Yes, but only to that of what Mr. Vesely said,

6 and Mr. Vesely said that Derek Colwell did, in fact,

7 provide him permission to access it.

8    Q.   Okay.  And I realize you're -- it's your

9 understanding from the discussion internally with

10 Mr. Vesely, but do you know, based on that, whether the

11 discussion between Mr. Colwell and Mr. Vesely was

12 specific to accessing that computer just to establish a

13 connection to the washing machine, or to download

14 information, or otherwise?

15    MR. KILBY:  Objection.  Form.

16    THE WITNESS:  I -- I don't know the specifics.

17    I wasn't present during that conversation, but what

18    Mr. Vesely said during his interview was that he

19    requested permission to access the Softrol computer

20    to establish or work to establish communication

21    with the washer.

22 BY MR. ROGERS:

23    Q.   Okay.  You're not aware of any requests or

24 communication between Mr. Vesely and Mr. Colwell about

25 Mr. Vesely making a site file backup or otherwise

Page 31

1 downloading any information from that computer, are you?

2    A.   I am not.

3    Q.   You -- okay.  Do you know what the site backup

4 that's referenced in Mr. Vesely's e-mail to Mr. Wilhoit

5 is?

6    A.   Yes.

7    Q.   Can you tell me what that is, to your

8 understanding?

9    A.   In this particular case, I don't have direct

10 knowledge of the site backup from Denver, but in my

11 working with Softrol in the past, a site backup is

12 essentially a copy of the information that is on the --

13 the computer and -- and contained within that software.

14    Q.   Okay.  And we're talking about the computer,

15 in this instance, that belongs to Washing Systems; is

16 that correct?

17    A.   The -- the one at the Denver facility?

18    Q.   The one from which the site backup to

19 Mr. Vesely's laptop was made, as referenced in this e-

20 mail we've been looking at?

21    MR. KILBY:  Objection to form.

22    THE WITNESS:  Yeah.  I don't know who owns it.

23    I'm -- my assumption is that WSI owns it, but yes.

24    We are referencing the same computer.

25 BY MR. ROGERS:

Page 32

1    Q.   Do you know what kind of information,

2 generally speaking, would be within that site backup

3 file?

4    MR. KILBY:  Objection.  Vague as to the -- and

5    do you just mean that WSI file or the other site

6    backup files he had experience with?

7    MR. ROGERS:  Yeah.  That -- that's fair, Matt.

8 BY MR. ROGERS:

9    Q.   Specific to the site file or the site backup

10 that's referenced in Mr. Vesely's e-mail that we're

11 looking at, do you know what kind of information was in

12 that site backup file?

13    A.   That specific one?  No, I -- I -- I have never

14 seen it.

15    Q.   Okay.  Are you familiar with the concept of a

16 site backup from the Softrol software as a general

17 proposition?

18    A.   Yes.

19    Q.   Okay.  And generally, when you talk about a

20 site backup from the Softrol software, what kind of

21 information would ordinarily be pertained in -- in -- in

22 that?

23    A.   It would vary by location and the diligence of

24 the -- either the individual working at that site or the

25 -- that of the -- organization supporting that

Page 33

1 individual, so I'd say it varies.  But generally

2 speaking, it would have the chemical names, the chemical

3 dosing, and then, depending on the -- a particular --

4 like, the type of the particular washer, it could have

5 further information around formula structure.

6    Q.   Can you explain to me what "further

7 information around formula structure" means?  And I mean

8 that sincerely.  I'm not in this business, so that's --

9 it sounds like a technical term to me.  I'm just curious

10 what that -- if you'd unpack it from sort of a lay

11 person's --

12    A.   Sure.  So in Denver, there are -- there --

13 there was one washer.  It was an Ellis, and the Ellis

14 had a Softrol controller.  The Softrol controller is

15 essentially or has a similar computer on it than -- of

16 that of the Softrol computer that we are speaking of,

17 which means that communication is -- is rather seamless.

18 The information contained on the washer in question,

19 that -- that controller and the -- and the Softrol

20 computer software would be nearly identical with regard

21 to the chemical formulation.  Only that washer, though.

22 So in that washer, that -- that washer in particular,

23 the site backup likely had steps that would tell the

24 washing machine what to do and when to do it and how to

25 do it in general terms.  In all other washing machines,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1  it would have just contained what we call chemical
2  injections, and then the -- the chemical name and the
3  dosing, the -- the -- the amount of chemical that would
4  have been programmed in that state.
5      Q.  Is that the sort of information that Ecolab
6  uses when it uses Softrol for the work that Ecolab
7  provides for industrial laundry providers or others, if
8  you know?
9          MR. KILBY:  Objection.  Vague.
10         THE WITNESS:  Yeah.  I guess if you're
11     referring to, like, Aramark, for example, that uses
12     a similar dispenser and software.  Then it -- it
13     would be site-dependent, and it would be washer-
14     dependent.
15         MR. ROGERS:  I -- just as an aside, I'm going
16     to put in this document we've been talking about,
17     Ecolab 1086, as Exhibit 1 to the deposition.  We'll
18     make a list and provide it, Hannah, to you as the
19     court reporter.  And Matt, we'll copy you on that
20     to make sure that we're all on the same page, but
21     we're marking --
22             (EXHIBIT 1 MARKED FOR IDENTIFICATION)
23  BY MR. ROGERS:
24     Q.  But I'll move on from that for right now and
25  ask you, still on topic two, Mr. Berman, are you aware -

Page 35

1  - aside from Mr. Vesely, are you aware of any others in
2  Ecolab who knew, around the time of June 22nd or 23rd of
3  2023, that Mr. Vesely was creating a site backup from
4  the Softrol on the Denver desktop computer?
5      A.  No.
6      Q.  Mr. Wilhoit would have known that, correct, if
7  he read his e-mail from Mr. Vesely that we just looked
8  at?  Is that fair to say?
9          MR. KILBY:  Objection.  Calls for speculation.
10         THE WITNESS:  I guess in the context that you
11     stated it there, Mr. Vesely did, in fact, say that
12     he had a site backup, and he did -- he did let
13     Mr. Wilhoit know that.  So yes.
14  BY MR. ROGERS:
15     Q.  Okay.  Beyond those two individuals, you're
16  not aware of anybody else at Ecolab who was aware that
17  Mr. Vesely had created his site backup around that time?
18  Is that what your testimony is?
19     A.  Yes.
20     Q.  Mr. Vesely, after making this site backup
21  file, do you know what he did with it next, in terms of
22  doing anything with it or sharing it with others?
23     A.  I -- I guess it would depend on the time
24  frame, but yes.  During Mr. Vesely's discussion, he did
25  -- he did say what he did with it, yes.

Page 36

1      Q.  Okay.  And what is that, that he did with it?
2      A.  He said that he -- he put it on a travel
3  drive, and that he also put it on a -- a secondary
4  computer not issued by Ecolab.
5      Q.  What's a travel drive?  Is that what I would
6  call a thumb drive or an external flash drive?
7      A.  Yes.
8      Q.  Okay.  Do you know the whereabouts of that
9  travel drive?
10     A.  The specific whereabouts?  I do not, but I am
11  aware that, when the investigation ensued, that --
12         MR. KILBY:  Can I -- can I -- can I just
13     counsel?  Because he's at -- he's in a complicated
14     area of attorney-client privilege, so I just want
15     to counsel him that, if you know what the people
16     were instructed to do with drives, just -- you can
17     just tell him that instruction.  I just don't want
18     you to go much beyond that.  Does that make
19     sense --
20         MR. ROGERS:  Yeah.  And that's fair.  I'm
21     really not trying to invade the privilege.  I just
22     want to get to the -- cut to the chase, as it were.
23         THE WITNESS:  Yes.  Mr. Vesely was instructed
24     to mail it to a --
25         MR. KILBY:  Someone Counsel directed him to

Page 37

1      mail it to.
2          THE WITNESS:  Yes, sir.
3  BY MR. ROGERS:
4      Q.  The computer to which the -- Mr. Vesely first
5  saved the site backup, I think he refers to it as "my
6  laptop" in his e-mail.  Is that an Ecolab-owned laptop
7  computer?
8      A.  I'm -- I'm not sure what -- what he's
9  referencing.  As I mentioned, he had -- he -- he had two
10  computers, one that was an Ecolab-issued computer and a
11  second computer that he purchased on his own.
12     Q.  Okay.  And to your knowledge, the site backup
13  data ended up on both of those laptops.  Is that fair to
14  say?
15     A.  No, it is not.
16     Q.  Okay.  And I'm going to back up and make sure
17  I understand it.  I think I asked you where else that
18  the data in that site file -- what happened next in
19  terms of Mr. Vesely doing anything with it.  You
20  mentioned a travel drive.  You talked about that, and
21  you also, I think, said something about a secondary
22  computer that was not Ecolab's?  Yeah.  What I'm trying
23  to understand is what do you mean by a secondary
24  computer that was Ecolab's?
25     A.  Yeah.  I -- I -- so what I recall saying is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  that the information, the site backup that you
2  referenced, was, in fact, contained on the flash drive
3  or travel drive and a secondary computer.  What you had
4  said it -- recently was that that site backup was
5  contained on both computers.  I don't have recollection
6  of whether that was true or not.  What Mr. Vesely said
7  was that it was on the secondary computer, and the
8  secondary computer was not issued by Ecolab.  So whether
9  it's Ecolab's property or not, I'm not privy to.  But
10 there -- there were two computers in question here, one
11 that was issued by Ecolab and that one was purchased by
12 Mr. Vesely.  And it is my understanding via Mr. Vesely's
13 discussion that the information from the travel drive
14 was put on that secondary computer that was not issued
15 by Ecolab.
16     Q.   Okay.  And the computer that was issued by
17 Ecolab, you have no knowledge of the site backup file
18 ever being put on that computer.  Is that what you're
19 saying?
20     A.   I have no knowledge of that.  That is correct.
21     Q.   Okay.  So based on that understanding, is it
22 your assumption that the reference in Mr. Vesely's e-
23 mail of June 23rd to "my laptop" refers to that
24 secondary non-Ecolab-owned laptop that we've been
25 discussing?

Page 39

1           MR. KILBY:  Objection.  Calls for speculation.
2           THE WITNESS:  I -- I would be assuming, but
3      that is my understanding.
4  BY MR. ROGERS:
5      Q.   Okay.  Thank you.  So Mr. Vesely has the site
6  backup on the travel drive, and he's got it on the other
7  computer.  What information do you have about what
8  occurred with the information from that site backup
9  next, after Mr. Vesely takes it on the travel drive and
10 on the other computer --
11     A.   According to Mr. Vesely --
12     Q.   -- if any --
13     A.   Yeah.  Go ahead.  I'm sorry.
14     Q.   No.  Just if any.
15     A.   Sure.  Mr. Vesely -- during the discussion
16 with Mr. Vesely, he said that the -- the weekend prior
17 to the installation, he used the site backup as a
18 starting point to create a mechanism to communicate with
19 the Ellis washer.  So he used it as a -- framework to
20 put in the Ecolab wash formulas.  He also said that he
21 downloaded that modified backup back to the Softrol
22 computer, and that it -- it crashed it. And then he
23 subsequently, following that, tried to download the
24 original backup back to that computer.  In addition to
25 that, I believe he said that he gave the modified site

Page 40

1  backup to Mustafa to determine whether or not he could,
2  in fact, establish communication with that Ellis washer.
3      Q.   By Mustafa, you mean Mustafa Al Sargi
4  (phonetic) who's identified in interrogatory answers
5  that we alluded to earlier?
6      A.   Correct.
7      Q.   Mr. Al Sargi, what was his role in relation to
8  the -- well, what's his role at Ecolab?
9      A.   He's on administrative leave at the moment but
10 during the times in question, he -- he was a territory
11 manager supporting Mr. Vesely with those types of skill
12 sets during the survey and the subsequent trial
13 installation.
14     Q.   Okay.  Does Mr. Al Sargi's administrative
15 leave have anything to do with the information in this
16 case?  I don't want to pry into his personal business if
17 he's out because of parental leave or something like
18 that, but was he placed on administrative leave in
19 connection with anything about what was done in Denver?
20     A.   I'm not privy to the specifics from a human
21 resources perspective, but yes.  I'd say that it is in
22 direct relation to what we are discussing.
23     Q.   Okay.  Is the same true of Mr. Vesely?  Is
24 Mr. Vesely on an administrative leave, as well?
25     A.   He was.  He is no longer an employee of

Page 41

1  Ecolab.
2      Q.   Do you know when his employment with Ecolab
3  ceased?
4      A.   I do not.
5      Q.   Do you know if the end of Mr. Vesely's
6  employment with Ecolab was because of what happened in
7  Denver with this computer issue we've been talking
8  about?
9      A.   I do not.
10     Q.   Do you know what happened with the secondary
11 computer that does not belong to Ecolab, on which Mr.
12 Vesely put the site file -- or site backup file?
13     A.   It was mailed to the same person that Matt had
14 just suggested Counsel told him to mail it to.
15     Q.   Thank you.  You're not aware, are you, of Mr.
16 Vesely still possessing the data from that site backup
17 since he has left employment at Ecolab, are you?
18     A.   Mr. Vesely was instructed to package up and
19 ship any and all property or anything that was used for
20 the trial to the -- the person or -- or individuals that
21 Mr. Kilby had suggested.  So whether or not he did all
22 of that, I can't speak to, but that -- those were the
23 instructions, that Mr. Vesely was supposed to pack up
24 his Ecolab-issued computer, his -- that personal
25 computer that we referenced, the site backup, and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  anything that was utilized for the trial at Denver and
2  ship it to the -- that -- those individuals or that
3  individual.
4      Q.   Thank you for that.  I guess my question is --
5  and I appreciate that.  My question is: Are you aware of
6  whether Mr. Vesely retained copies in any way of the
7  site backup file?
8      A.   I am not.
9      Q.   Do you know if Mr. Vesely was instructed by
10  anyone at Ecolab specifically not to retain any copies
11  of that site backup file or information pertaining to
12  it?
13     A.   I don't recall, but I could -- I can say
14  during the discussion, it was made clear that -- to
15  Mr. Vesely that anything in relation to what we are
16  discussing was to be packaged up and shipped.
17     Q.   We talked earlier in reference to that e-mail
18  that's in Exhibit 1 about the backdoor directions that
19  Mr. Vesely was provided.  Do you know if there is a
20  document or anything in writing that constitutes that
21  backdoor direction, whether it be a -- an attachment to
22  that e-mail or otherwise?
23     A.   All I've seen is what you showed me.
24     Q.   Okay.
25          MR. BURKHART:  Mr. Rogers, when you get to a

1  good point, can we take a short break?  Not to
2  interrupt, but just when you get to a good point.
3          MR. ROGERS:  No, it's fine.  And this is not
4  an endurance contest.  Now would be a fine time to
5  do that.  We'll take a break and come back on.
6  What do you think, Matt, five minutes?
7          MR. BURKHART:  Yeah --
8          MR. BURKHART:  Thereabout.  Okay --
9          MR. BURKHART:  Yep.
10             (OFF THE RECORD)
11         THE REPORTER:  We are on record.
12  BY MR. ROGERS:
13     Q.   All right.  Mr. Berman, we're back on the
14  record.  You understand you're still under oath?
15     A.   Yes.
16     Q.   We were talking when we took a break about
17  what happened with the information from the site backup.
18  We talked about the secondary computer and the travel
19  drive.  Do you know where else information from that
20  site backup may have gone?
21     A.   Only through Mr. Vesely's discussion and via
22  Counsel.
23     Q.   Okay.  And tell me your understanding of where
24  the information from that -- where else the information
25  from the site backup has gone, other than the two

1  devices that we've talked about?
2      A.   According to Mr. Vesely and -- and then in
3  discussing it with Counsel, it was provided to --
4          MR. BURKHART:  Can we stop a sec?  Just -- can
5  you first just tell him what Vesely said?  Because
6  I don't -- I don't know what you're referring to
7  about discussion with Counsel, so can we -- can we
8  break that up, Mr. Rogers?  And you can ask him
9  what Vesely told them.  Take it one step at a time,
10  if you don't mind.
11         MR. ROGERS:  That -- no, that's fine.  And we
12  -- I think we all understand that Mr. Berman is the
13  corporate representative for Ecolab on these
14  topics, so he --
15  BY MR. ROGERS:
16     Q.   We understand, Mr. Berman, that you don't
17  necessarily have firsthand experience or information
18  about some of these things, and you will have learned
19  that from others.  I don't always need to know if that
20  came from Counsel or somebody else.  If I do, I'll ask
21  specifically, but I don't want to -- I don't want to get
22  into attorney-client privileged communications that
23  you've had.  I'm just looking for the information in
24  substance, if that makes sense.
25     A.   It does.  Thank you for the clarification.  My

1  understanding is that Mr. Vesely provided the modified
2  site backup to Mustafa to work to establish
3  communication to the Ellis washer with the Softrol
4  control.
5      Q.   Okay.  Do you know what format in which that
6  was given to Mustafa Al Sargi by Mr. Vesely?  In other
7  words, was it on a flash drive or a -- some other
8  device?
9      A.   I would be assuming.  Yeah.  But it -- it -- I
10  don't know how -- there -- there are only a couple ways
11  to -- to give people digital information.
12     Q.   Okay.  And what would those ways be, to your
13  understanding?
14     A.   Either through a flash drive or through e-
15  mail.
16     Q.   But as we sit here today, you don't know in
17  what manner, whether flash drive, e-mail, or otherwise,
18  that site backup information was provided to Mr. Al
19  Sargi.  Is that fair to say?
20     A.   It is accurate.  All I understood was that a -
21  - a modified copy was provided to Mustafa.
22     Q.   Okay.  Do you know when that copy would have
23  been provided to Mustafa?  In other words, was it at the
24  time they were there on site in the Denver plant or
25  otherwise?  I'm just trying to put context around it.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1    A.   I do not know.

2    Q.   Do you know what, if anything, Mustafa Al

3  Sargi did with the site backup information that he was

4  provided by Mr. Vesely?

5    A.   He tried to establish communication with the

6  washer to download that information.

7    Q.   What -- I may be lost here a little bit. What

8  information was he trying to download from the washer?

9    A.   To the washer or from the washer?

10   Q.   I thought you said from the washer, and so I

11  may have misheard.

12   A.   No, to the washer.

13       MR. BURKHART:  I -- yeah, I think -- I think

14       he's just using -- Mr. Rogers, I think he's using

15       download in a way where we might think upload. So

16       I think if you both specified to the washer or from

17       the washer, that'll clear it up.

18       THE WITNESS:  What I'm referring to is taking

19       information from a -- in this case, Mr. Mustafa's

20       computer to push it to the washer, download it to

21       the washer in question, that controller.  And my

22       understanding was that it was the modified formulas

23       that would need to be contained within that washer

24       to allow the washer to run.

25  BY MR. ROGERS:

Page 47

1    Q.   Okay.  And those modified formulas were

2  formulas that were taken from the desktop computer in

3  that site file backup -- or site backup file, then

4  modified by someone at Ecolab, and then put in their

5  modified form or attempted to put in their modified form

6  back onto the computer to feed it to the washing

7  machine.  Do I have that correct?

8    A.   It depends on who you're referring to.

9  Mr. Vesely did try to download -- so from that secondary

10  computer or a travel drive to the computer, that's what

11  Mr. Vesely said.  My understanding is that Mustafa did

12  not have access or touch the -- physically touch the

13  computer, but that he did try to establish communication

14  with the washer to, in fact, download that information

15  to that washer.

16   Q.   Okay.  And how would Mustafa do so without

17  going through the computer?

18   A.   The controller itself -- yeah.  Go ahead.  I'm

19  sorry.

20   Q.   No, if you know.  I -- I'm sure that I'm

21  revealing my ignorance about the technology here, but

22  inquiring minds want to know, so --

23   A.   No, I get it.  I -- and I appreciate the

24  question.  I wasn't on site, so I can't directly say

25  what did and didn't happen.  But it is my understanding

Page 48

1  that the -- the washer has a Softrol controller, which I

2  know to be fact, and that if you open the controller --

3  like, the control panel, there are cards, computer

4  cards, and the -- one of the cards in and itself has a

5  mechanism that you can connect a computer to.

6    Q.   Okay.  So you would need some sort of computer

7  to connect to that mechanism, it wouldn't have to be the

8  desktop computer that belong that belongs to Washing

9  Systems.  It could be some other computer; is that

10  correct?

11   A.   Yes.  That's my understanding of the

12  technology that -- and that's what my understanding of

13  Mr. Vesely and Mr. Al Sargi were trying to do is

14  establish communication directly with that washer.

15   Q.   Okay.  So we talked a moment ago about the

16  format or mechanism whereby Mr. Al Sargi obtained that

17  site backup information.  My recollection is you said

18  you were not aware specifically of that.  So my next

19  question in that -- if I have that correctly, and you

20  correct me if I'm wrong.  My next question in that line

21  is when Mr. Al Sargi was placed on administrative leave

22  or at some other time, did anybody ask him if he had the

23  site backup information or how he got it?

24   A.   I -- I can't speculate to that.  I was not

25  privy to any of those discussions.

Page 49

1    Q.   Okay.  And you don't know if Mr. Sargi -- Al

2  Sargi received instructions similar to those we talked

3  about with Mr. Vesely earlier, to return whatever

4  electronic information or devices he had to Ecolab or

5  Ecolab's counsel prior to leaving for administrative

6  leave.  Is that fair to say?

7    A.   No --

8        MR. BURKHART:  Objection to form.

9        THE WITNESS:  Yeah.

10       MR. BURKHART:  Go ahead.

11       THE WITNESS:  No.  I -- I'm aware that all six

12       individuals were instructed to ship in all of their

13       electronic devices that had anything to do with the

14       trial at Denver.

15  BY MR. ROGERS:

16   Q.   What six individuals are you referring to?

17   A.   The ones that are on administrative leave.

18   Q.   Can you provide the names of those

19  individuals, please?  I assume we're talking about

20  Mustafa Al Sargi.  That's number one, so who are the

21  other five, if you can recall any?

22   A.   Sure.  So Mustafa, you -- you're correct that

23  that would be one of the individuals.  Carl Mattson

24  would be one of the individuals, Adam Vesely would be

25  one of the individuals, Nick Wagner would be one of the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  individuals, Akamu Aki would have been one of the
2  individuals, and Doug Bialza would have been one of the
3  individuals.
4      Q.   I may not be writing as quickly as our court
5  reporter so I'm going to go back and see if I've got
6  those names correctly.  Carl Mattson?
7      A.   Correct --
8      Q.   Correct?  Nick Wagner, correct?
9      A.   Yes.
10     Q.   Doug Bialza, correct?
11     A.   Correct.
12     Q.   You're going to have to help me, if you're
13 able, on the next one.  Akamu Aki?
14     A.   Correct.
15     Q.   Can you give us a suggestion of how to spell
16 Akamu Aki?
17     A.   Sure.  A-K-A-M-U.  That's his first name.  Aki
18 is A-K-I.
19     Q.   Thank you.  I'm sure it's written in these
20 documents.  I just didn't have it on hand.  I appreciate
21 that.  So Mattson, Wagner, Aki, Bialza, Al Sargi, and
22 Vesely.  Is that the six individuals?
23     A.   Yes.
24     Q.   Thank you.  Do you know whether each of those
25 individuals did, in fact, have information from the site

1  backup file that they then turned in to someone on
2  behalf Ecolab in response to that?
3      A.   I -- I don't have any (Inaudible) on -- of
4  that other than what I told you previously.
5      Q.   Thank you.  And aside from Mr. Vesely, who I
6  think you said is no longer employed by Ecolab, did I
7  understand your answer previously correctly that the
8  other five are all on administrative leave?
9      A.   That is correct.
10     Q.   And are those five all on administrative leave
11 for the same general reason as we talked about with
12 Mr. Al Sargi previously?
13     A.   I'm not privy to why they're on administrative
14 leave, but as I've mentioned previously, my -- that --
15 it is my understanding that they are on administrative
16 leave because of the topics we are discussing.
17     Q.   Okay.  Thank you.  I want to go to another one
18 of the documents on the link, so you may have timed out
19 of that.  If you start --
20     A.   No, go ahead.  Yep.
21     Q.   It's Ecolab 001085.
22     A.   It is two e-mails, one originating from
23 Mr. Wagner and then the second one from Mr. Vesely?
24     Q.   Yes, sir --
25     A.   It does, in fact, have Ecolab 001085 at the

1  bottom right-hand corner.
2          MR. ROGERS:  And Matt, are you with us?
3          MR. BURKHART:  Yep.  I see it --
4          MR. ROGERS:  Check it.
5          MR. BURKHART:  Thank you.
6  BY MR. ROGERS:
7      Q.   So the e-mail from Mr. Wagner to Mr. Vesely is
8  dated July 11th, 2023, and it's also someone named
9  Jerry Pavlatos.  I may not have pronounced that name
10 correctly, but do you see Jerry Pavlatos also as a
11 recipient on that e-mail?
12     A.   I do, and you did pronounce his name
13 correctly.
14     Q.   Good.  What is Mr. -- I -- and I hate to
15 presume anyone's pronouns or gender.  Is it
16 Mr. Pavlatos?
17     A.   Correct.
18     Q.   What is Mr. Pavlatos' role with Ecolab
19 generally?
20     A.   He is a corporate account manager.
21     Q.   Okay.  So the document has been redacted.  This
22 is how it was provided to us.  The subject of the e-mail
23 is "Denver" blank, redacted.  Do you see that?
24     A.   Yes.  Yeah.
25     Q.   Do you know what word or words was redacted

1  after the word Denver in the subject?  Just a yes or no
2  question.
3      A.   Yes.
4          MR. BURKHART:  And I would -- if I could just
5  interject on the redactions, on this document and
6  ones in this chain, I would be comfortable having
7  an agreement that he can just testify freely about
8  what -- you know, about what was redacted.  It will
9  just -- if we can agree that the confidential
10 information terms of the last draft of the
11 protective order exchanged between the parties
12 would apply to that.  In part, this was -- this
13 document was redacted when we didn't know whether -
14 - what was Cintas information or Ecolab information
15 and WSI information, and so part of it was a
16 concern about protecting the customer information.
17 But as between these two companies, if we have an
18 agreement on confidentiality along the lines of
19 that last draft, I think that'll handle this
20 redaction in this document.  But it's up to you if
21 you want to agree to that.
22         MR. ROGERS:  Yeah, I don't know enough to know
23 whether to agree to that or not, Matt.  Let me ask
24 you this.  I know you're not on the stand here, but
25 is this third-party information that we're talking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1  about, or is it information that belongs to Ecolab
2  or Washing Systems?
3      MR. BURKHART: It -- well, it would be
4  information that Cintas knows, also, but since it's
5  either WSI, Ecolab, or Cintas, what I'm telling you
6  is so long as -- since it's customer information,
7  we have the same -- the companies have the same
8  customer. I'm comfortable with him disclosing that
9  so long as we just agree that we'll keep it
10  confidential within the litigation.
11      MR. ROGERS: Well --
12      MR. BURKHART: So the customer information
13  isn't used outside of it, if that makes sense.
14      MR. ROGERS: Yeah. Let me go about it a
15  different way --
16      MR. BURKHART: Sure.
17      MR. ROGERS: -- and I don't mean to be
18  disagreeable. But I guess my question -- and tell
19  me if you would be comfortable with this, Matt, my
20  question to Mr. Berman is: Can he tell me the
21  general nature, without disclosing something that's
22  sensitive or commercially protectable in some way,
23  what kind of thing is redacted here? Is it the
24  name of a chemical, the name of a company, a
25  product, a -- do you know what I mean? That sort

Page 55

1      of a thing. Just what we're talking about.
2      MR. BURKHART: Go ahead. You can answer.
3      THE WITNESS: Yes.
4  BY MR. ROGERS:
5      Q. Okay. And which of those?
6      A. What is the -- what is it, the -- the word
7  retracted [sic] covering up?
8      MR. BURKHART: Yeah, just --
9  BY MR. ROGERS:
10      Q. Yeah --
11      MR. BURKHART: -- whether it's a company name,
12  or a person's name, or a chemical name, right?
13      THE WITNESS: My understanding is a chemical
14  name.
15  BY MR. ROGERS:
16      Q. Okay. Is it a -- okay. And would that be
17  true of -- let's go through the e-mail chain here just
18  to make sure I'm thorough about it, of all the
19  redactions. So the -- there is the subject line, which,
20  of course, is redacted the same way in both e- mails
21  because it's the same subject. That's a chemical name
22  in that subject line; is that right?
23      A. That's my understanding.
24      Q. Okay. And then there is -- in the first line
25  of Mr. Wagner's e-mail, "I'm looking for clarification

Page 56

1  on which formulas are currently using" blank "at
2  Denver." That's a chemical name, as well?
3      A. My understanding is yes.
4      Q. Okay. Then there is a sentence that says,
5  "Are there any other classifications where the smell is
6  a" -- is that a redaction or is that just a blank space
7  on the way the e-mail printed? It says, "smell is a"
8  blank "concern". Do you see that?
9      A. I do. I believe it's just a blank space.
10      Q. Okay. And then that last line, "Currently
11  using" blank, redacted, question mark. The same answer
12  as the others?
13      A. Correct.
14      Q. Thank you. I want to put this in as Exhibit 2
15  to the deposition and ask you, Mr. Berman, what, if
16  anything, you can tell us on behalf of Ecolab was the
17  context of Mr. Wagner sending this e-mail to Mr. Vesely
18  and Mr. Pavlatos?
19          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
20      Q. My understanding in speaking with Mr. Wagner
21  was that he was trying to determine which of the Denver
22  classifications that facility was washing that contained
23  a marijuana smell that we would have to address.
24  BY MR. ROGERS:
25      Q. Okay. Mr. Wagner, it says in the e-mail -- it

Page 57

1  lists him as lead chemist, textile care division. Is
2  that, at the time, I guess, was his title; is that
3  right?
4      A. Yes.
5      Q. But what is -- what was Mr. Wagner's role as
6  lead chemist as it pertains to the Denver pilot with
7  Cintas that Ecolab was undertaking?
8      A. The development of the formulas, the wash
9  formulas.
10      Q. Okay. The development of the wash formulas,
11  is that the chemistry that goes into Ecolab's process
12  for washing different kinds of textiles for the
13  customer?
14      A. It -- it's, I'd say, a little broader than
15  that.
16      Q. Okay. What else -- what am I missing? Again,
17  I'm -- I -- this -- I'm not in this industry, so I'm not
18  trying to be cute about it. I genuinely don't know.
19      A. No, I understand. I appreciate that. It --
20  it would -- it would depend on how we would define wash
21  formulas, but in the case I'm referencing, it would have
22  the -- the step, the name of the step, the time, the
23  temperature, the level of water, the location that the
24  water is coming from and going to, and it would have the
25  chemical names and the associated chemical dosing

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  amounts.

2     Q.  And Mr. Wagner, as a -- as the lead chemist,

3  his role, if I understand it correctly, was to develop

4  that process or the -- that chemistry in that formula or

5  work in the development of such things so that Ecolab

6  can perform that service for its customer, in this case,

7  Cintas; is that right?

8     A.  Yes.

9     Q.  Do you know why Mr. Wagner e-mailed Mr. Vesely

10  and Mr. Pavlatos asking for clarification on what

11  formulas were being used at the Cintas Denver plant?

12     A.  I have -- I was on a -- a discussion with

13  Mr. Wagner recently, and -- and he did provide some

14  insight into that, yes.

15     Q.  Okay.  And what was that insight that he

16  provided?

17     A.  He was seeking which classifications did, in

18  fact, have the Denver smell.  We -- we have -- we asked

19  the -- the corporate office and we asked the -- the

20  plant itself if there are any site-specific

21  classifications that require special treatment, and

22  during that discussion, marijuana smell or -- they had

23  customers that, in fact, did or do use marijuana in

24  their -- in their processing and in their wearing and

25  that it did, in fact, have a marijuana smell.  And that

1  was one of the things that we had to make sure that we

2  addressed, and he was looking -- Mr. Wagner was seeking

3  information to confirm what the facility had already

4  told us on whether or not or which classifications, in

5  fact, were being used to treat said smell.

6     Q.  Was -- did Mr. Wagner utilize the information

7  from the site backup to create or modify any formulas

8  that were then used subsequently by Ecolab at the Denver

9  Cintas plant?

10     A.  According to Mr. Wagner's discussion that I

11  was privy to, the answer to that is no.

12     Q.  Other than the marijuana smell chemistry that

13  we've been talking about, is that fair to say?

14     MR. BURKHART:  Objection.  Misstates testimony

15  and evidence.

16     THE WITNESS:  No, it is not fair to say.

17  BY MR. ROGERS:

18     Q.  Okay.  So -- and I'm genuinely just trying to

19  understand here.  Mr. Wagner asked Mr. Vesely this

20  question in the e-mail about clarification on the

21  formulas at the Denver plant, and he was doing that in

22  order to determine what formulas would be used

23  subsequently by Ecolab at the Denver plant.  Is that not

24  accurate?

25     A.  Not to my understanding, no.

1     Q.  Okay.  Then why -- and I apologize if you've

2  answered this.  I just don't understand.  Why would --

3  if you know, why would Mr. Wagner have asked this

4  question in the e-mail to Adam Vesely?

5     A.  As I stated previously, Mr. Wagner, as -- as

6  he said during that discussion that I referenced, was

7  trying to determine which formulas were being used to

8  treat the marijuana smell.

9     Q.  Do you know why he would care what formulas

10  were being used to treat the marijuana smell?

11     A.  Do I know specifically?  No.  I didn't ask

12  him, and he didn't volunteer that information.

13     Q.  Okay.  So you don't know, as we sit here

14  today, whether he asked for what chemicals were being

15  used to treat the marijuana smell, just out of idle

16  curiosity or some other reason; is that accurate?

17     MR. KILBY:  Objection.  Form.  Sorry.

18  Objection.  Form.

19     THE WITNESS:  We -- we, as in Ecolab, we're

20  required to ensure that the garments themselves or

21  the classifications were of the same wash quality

22  as the existing state.  In this case, as you're

23  specifically mentioning, we were -- we would have

24  to -- had to ensure that there was no marijuana

25  smell coming from the garments, so ensuring that we

1  understood which garments and which wash formulas

2  were being used to wash said garments would have

3  been important.

4  BY MR. ROGERS:

5     Q.  Okay.

6     A.  But we did get that information from the

7  facility.

8     Q.  Let's move on to the next document if we can,

9  and it is Ecolab 001088.

10     A.  Okay.  I am reviewing said document, Ecolab

11  00108.  At the bottom right-hand corner, appears to be a

12  message from Mr. Wagner to Mr. Vesely, and then

13  Mr. Vesely's response to Mr. Wagner.

14     Q.  Okay.  If you need a moment to take a look at

15  this, please take your time.  But isn't this the same e-

16  mail from Mr. Wagner to Mr. Vesely and Mr. Pavlatos that

17  we talked about a moment ago, but this time with a

18  different response from Mr. Vesely back to Mr. Wagner?

19     A.  Yes.  I -- I'd say just in -- without

20  comparing them side by side, the original e-mail from

21  Mr. Wagner does appear to be the one we had reviewed

22  previously, and it does -- yes, the -- Mr. Vesely's

23  response is, in fact, different.

24     Q.  Okay.  And Mr. Vesely's response, it looks

25  like it was sent on July 12th, 2023; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   That's what the -- the e-mail states, yes.

2    Q.   Okay.  Nobody from Ecolab was at the Denver

3  Cintas plant in this timeframe in July.  Isn't that

4  true?  Weren't they -- didn't they go in June and then

5  come back to start the conversion at the end of July or

6  beginning of August?

7    A.   From a team perspective, yes.  But whether or

8  not Mr. Vesely stopped by the facility during the time

9  period from the two dates you referenced, I am not

10  aware.

11    Q.   Okay.  Where was Mr. Vesely based out of at

12  this time?  He didn't -- did he live in Denver?

13    A.   He did, yes.

14    Q.   Okay.  So Mr. Vesely responds to the e-mail

15  here, but it appears that he takes Mr. Pavlatos out of

16  the response.  In other words, he responds back to

17  Mr. Wagner, but Mr. Pavlatos is no longer copied on that

18  response.  Is that accurate to your understanding?

19    A.   According to the -- the document that I'm

20  looking at, yes.

21    Q.   Okay.  You don't know why Mr. Vesely dropped

22  Mr. Pavlatos off the response here, do you?

23    A.   I do not.

24    Q.   The response from Mr. Vesely says, "Nick,

25  here's what I have.  I'm not sure if they call" blank,

1  which is redacted, "something else, but this is their

2  current dosing in a 900 Ellis."  Did I read that

3  correctly?

4    A.   Yes.

5    Q.   The redacted word in that e-mail, is it the

6  same name or identifier for a chemical that we talked

7  about earlier?

8    A.   Without seeing the original e-mail, I -- I

9  can't comment.

10    Q.   Okay.  You don't have any reason to believe

11  that it's something different, but you don't know for

12  certain that it's the same.  Is that fair to say?

13    A.   That is fair to say.

14    Q.   Okay.  Is a 900 Ellis a particular washing

15  machine?

16    A.   It is.

17    Q.   And so if you're providing chemistry and a

18  wash formula process for a particular type of garment,

19  that may vary depending on what type of machine you're

20  using.  Is that generally correct?

21    A.   Yes.

22    Q.   Okay.  The e-mail indicates that there's an

23  Excel spreadsheet attachment.  Do you see that, where it

24  says, "attachments" there?

25    A.   Yes.

1    Q.   Okay.  Do you know what that spreadsheet

2  attachment was that was sent with his e-mail?

3    A.   I do not.

4    Q.   Do you know where Mr. Vesely obtained the

5  information that he was sending back in the attachment

6  to Mr. Wagner?

7    A.   Not without speculating.

8    Q.   Okay.  He says in that second sentence, "I'm

9  not sure if they call" blank "something else."  You see

10  that?

11    A.   Yes.

12    Q.   You know when he says, "they" to whom he is

13  referring in this e-mail?

14    A.   It would also be speculation.

15        MR. ROGERS:  Okay.  Off the record for a

16  second.

17           (OFF THE RECORD)

18        THE REPORTER:  We're back on.

19  BY MR. ROGERS:

20    Q.   Sorry about that.  I would like to introduce

21  this document, 1088, as Exhibit 3 to the deposition.  If

22  you could, take a look at the files and see if you can

23  find Ecolab 1089?

24           (EXHIBIT 3 MARKED FOR IDENTIFICATION)

25    A.   Okay.  Are we done with the 1088 document?

1  BY MR. ROGERS:

2    Q.   Yes, sir.  Thank you.

3        MR. KILBY:  And you -- just before he opens

4  that, is that the -- is that the Excel attachment,

5  Mr. Rogers?

6        MR. ROGERS:  That's my belief.

7        MR. KILBY:  Okay.  I --

8        MR. ROGERS:  It's the next document

9  sequentially, and that's --

10        MR. KILBY:  Yeah.

11        MR. ROGERS:  -- what I'm trying to sort of

12  verify.

13        MR. KILBY:  It is.  It's -- so I just want to

14  make a short statement.  I don't want to impede

15  your deposition, but I want to tell you that we

16  have intentionally not shown him that attachment to

17  that document.  To my knowledge, only people who

18  have seen it are two people on leave, Vesely and

19  Wagner.  So if you want to show this document to

20  this witness, that -- you know, that's your

21  decision.  I understand your client contends that

22  maybe it's information.  I want you to know that I

23  haven't shown it to him, so you have that

24  information when you make this decision.

25  BY MR. ROGERS:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Well, let's -- let's -- let's not have
2 you open that document then, Mr. Berman.  If you have,
3 can you close it out?
4        MR. ROGERS:  And I appreciate that, Matt.
5 BY MR. ROGERS:
6    Q.   We just had a discussion, Mr. Berman, about
7 the -- a spreadsheet that was the attachment to the e-
8 mail you and I have been discussing, and you heard
9 Mr. Kilby say to me just now that you had not been
10 provided that spreadsheet.  Do you remember that
11 discussion just a moment ago?
12   A.   Yes, yeah.
13   Q.   Is that -- to the best of your knowledge, is
14 that accurate --
15   A.   100 percent.  Yeah.  Go ahead.  Sorry.
16   Q.   If there is an attachment that's a spreadsheet
17 to that e-mail, you -- to -- you have no recollection of
18 seeing that, fair?
19   A.   That is fair.  And I did not open the
20 document.
21   Q.   Okay.  Thank you.  We went through a list of
22 names earlier of folks who you said were on
23 administrative leave, and I cannot recall specifically
24 if we discussed whether those folks had been requested
25 to turn over whatever documentation or electronic

1 devices that they had, that might pertain or contain the
2 site backup file.  Do you remember the list that I'm
3 referring to?
4    A.   I do if you're referring to the six
5 individuals that we discussed.
6    Q.   Yes.  And I know we talked about Vesely and Al
7 Sargi.  The other ones, Mattson, Wagner, Aki, and Bialza
8 -- and I apologize if I've asked this before.  Those
9 individuals were also asked to provide whatever storage
10 devices or data that they had that pertained to that
11 site backup file; is that true?
12   A.   I don't know whether it's true or not.  I
13 wasn't privy to any of the -- those conversations, but
14 it is my understanding that, yes, all six individuals
15 were, in fact, told to -- to do what you had just
16 suggested.
17   Q.   Okay.  Thank you.  And do you know whether any
18 of those individuals did, in fact, have storage devices
19 that they -- on which they add the site backup file
20 information that we've been discussing?
21   A.   I do not, no.
22   Q.   I want to move over to topic number three from
23 the deposition notice, and that topic is all steps taken
24 by Ecolab to use any portion of the information taken
25 from the Washing Systems' desktop in any way, including

1 but not limited to how Ecolab utilized or referenced any
2 such information to develop formulas or strategies for
3 its pilot program with Cintas at any location.  Does
4 that comport with your recollection of what one of the
5 topics was that you were asked to address in today's
6 deposition?
7    A.   If you're referring to that, was it -- was
8 that in -- in -- in the notices -- in number three? Yes,
9 I believe that's correct.
10   Q.   Okay.  And we talked a little bit about this,
11 but my question is: Are you aware of any use by anyone
12 at Ecolab of the -- well, let me strike that.  I'm
13 sorry.  I'm going to go about that a different way.  I
14 apologize.  Are you aware of whether Carl Mattson ever
15 obtained a copy of the site backup file that was taken
16 from the desktop computer in Denver?
17   A.   I'm not aware, but in the discussion I had
18 with Mr. Vesely, he did not reference Mr. Mattson at all
19 as -- as having said backup.
20   Q.   Okay.  So Mr. Vesely did not indicate -- to
21 your knowledge, did not indicate that he, Mr. Vesely,
22 sent any such information to Mr. Mattson?
23   A.   I did not --
24   Q.   Is that what you're saying?
25   A.   That is what I'm saying.

1    Q.   Okay.  Did Mr. Vesely indicate whether --
2 well, strike that.  Mr. Vesely wouldn't know if
3 Mr. Mattson got that information from some other source,
4 would he?
5    A.   I'd be speculating.
6    Q.   Do you know whether Akamu Aki ever had
7 possession of the information from the site backup file
8 that we've been discussing?
9    A.   I do not.
10   Q.   Do you know whether Doug Bialza ever had
11 possession or access to that site backup information?
12   A.   I do not.  All I am privy to is what
13 Mr. Vesely stated, and that is that he -- he had the
14 backup.  And after the modification, he provided it to
15 Mustafa to establish communication, and then via the e-
16 mail that you just showed, it -- there was some
17 correspondence with Mr. Wagner.
18   Q.   I'm sorry.  I lost the audio feed for a moment
19 there.  It may have just been on our end.
20        MR. KILBY:  You want --
21 BY MR. ROGERS:
22   Q.   Do you --
23        MR. KILBY:  -- the court reporter to read back
24 what she got?
25        (REPORTER PLAYS BACK REQUESTED

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    TESTIMONY)
2    THE REPORTER: Everybody hear that okay?
3    THE WITNESS: Yes.
4    MR. KILBY: Thank --
5    MR. ROGERS: Okay.
6    MR. KILBY: -- you.
7    MR. ROGERS: Thank you. The audio's been very
8    good so far, so hopefully that's the one and only
9    hiccup we have with that.
10   BY MR. ROGERS:
11   Q. Are you aware of Mr. Al Sargi providing the
12   data or information to anyone else?
13   A. No.
14   MR. ROGERS: I know we haven't been going an
15   hour yet. Let's take a quick break so that I can
16   transition and hopefully finish up without too much
17   (Inaudible), if that's okay.
18   (OFF THE RECORD)
19   THE REPORTER: And we are on record.
20   BY MR. ROGERS:
21   Q. All right. We're back on, Mr. Berman. You
22   understand you're still under oath?
23   A. Yes. Yeah.
24   Q. We've talked a little bit about the list of
25   six individuals, and I want to go back through them and

Page 71

1    make sure that I understand the roles of each of those
2    person -- each of those persons has or had with Ecolab,
3    and I'll start with Carl Mattson. What is or was
4    Mr. Mattson's role at Ecolab?
5    A. He -- Mr. Mattson kind of was acting as a
6    project manager.
7    Q. Okay. And what does a project manager do,
8    just in terms of -- I might explain it to an intelligent
9    middle schooler?
10   A. In the case of --
11   Q. -- smarter way, I can.
12   A. Yeah. No, I understand, I think. He -- so
13   you -- you have -- you have me, kind of overall general
14   management. You have Jerry Pavlatos who would have been
15   -- in that -- in the number two, if you will, acting in my behalf
16   if I wasn't there. And then Carl Mattson would have
17   been the next person on the ground, kind of directing
18   traffic and making sure that the -- the -- the specifics
19   of what was needed to do, either during the -- the
20   survey or the subsequent installation, occurred.
21   Q. Okay. Thank you for that. Nick Wagner, we
22   talked a little bit about him. He was -- his title was
23   lead chemist. And his role, with respect to the Denver
24   pilot -- we talked a little bit about that. It was --
25   to my -- to my memory, to develop the chemistry and wash

Page 72

1    formulas that were to be used, but that's very generic
2    recollection of my understanding. Would you phrase it a
3    different way?
4    A. I think I -- I said it in a different way.
5    Mr. Wagner wasn't developing chemistry at the site,
6    right? The -- the chemistry was, in fact, developed
7    well before any interactions with Cintas. But
8    Mr. Wagner was, in fact, part of a team to develop the -
9    - the -- the -- the wash formulas themselves for Denver,
10   yes.
11   Q. Okay. But if the formulas had already been
12   developed, what would his role have been with the Denver
13   plant in terms of the pilot --
14   A. According to --
15   MR. KILBY: Objection. Misstates testimony.
16   THE WITNESS: According to Mr. Wagner, he used
17   the formulas that were already developed and in
18   place and operating successfully at the Milford
19   location. He essentially copied those over to the
20   Denver location, and he would have then modified
21   them for the site- specific information pertaining
22   to Denver. Those would have been formulas that are
23   at Denver that wouldn't have been at Milford, and
24   Denver is a unique situation, whereby it has a
25   filtration system that recycles and reuses water in

Page 73

1    a different fashion of that in Milford.
2    BY MR. ROGERS:
3    Q. Okay. And with that different filtration
4    system or water usage, that would call for some
5    additional work or involvement by Mr. Wagner as the lead
6    chemist?
7    A. That's right --
8    Q. Do I have that right?
9    A. That is correct, yes.
10   Q. The next name on my list is a Akamu Aki. What
11   was Akamu Aki's role at Ecolab, in particular as it
12   pertains to the Denver Cintas pilot?
13   A. He was also a territory manager, so the same
14   as Mr. Vesely. And he was there to support Mr. Vesely
15   in that -- in those subject matter expertise -- in that
16   subject matter expertise.
17   Q. And I believe you said that Mr. Al Sargi was
18   also a territory manager in that same or similar role;
19   is that right?
20   A. That is correct.
21   Q. That leaves, I think, Doug Bialza. Is that
22   B-I-A-L-Z-A?
23   A. B-I-A-L-Z-A. Yes.
24   Q. Okay. What role did Doug Bialza have for
25   Ecolab pertaining to the Denver Cintas pilot?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    A.  He was the district manager, so he was the
2  direct supervisor for Mr. Vesely and I believe Akamu.
3  But I -- I'd have to -- I -- I don't recall the specific
4  districts that they've shuffled around quite often, but
5  he for sure was the supervisor for Mr. Vesely and I also
6  believe Akamu.
7    Q.  Okay.  I'm going to go through a few more
8  documents, and hopefully we can do it relatively
9  quickly.  The first one is Ecolab 1224.  Let me know
10  when you have that up, please.
11    A.  Sure.  It seems like a combination document
12  that says 1224 and 1225; is that correct?
13    Q.  Yes.  It's a two-pager.  That's what I have.
14  Yes, sir.
15    A.  Yes, I have it up.
16    Q.  Okay.  So the -- it's an e-mail chain, and it
17  looks like the first e-mail is on August 4th, 2003 at
18  3:04 p.m. from Carl Mattson to a list of recipients and
19  CCs.  Do you see that?
20    A.  I do.
21    Q.  Okay.  And I think this is an e-mail
22  congratulating the team at the conclusion of that week
23  of conversion of the Denver plant to Ecolab's pilot.  Is
24  that your understanding of that e-mail, as well?  The
25  general context of that e-mail?

Page 75

1    A.  Yes.
2    Q.  Okay.  I'm going to put this in as Exhibit 4,
3  I believe.  And I'm going to ask you in that e-mail from
4  Mr. Mattson to the group there, that first e-mail in the
5  chain below, do you know -- and again, this is just a
6  yes or no question.  Do you know the nature of the
7  information that was redacted from that e-mail chain
8  here?
9           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
10    A.  I'm copied on the message, but I don't recall.
11  No.
12  BY MR. ROGERS:
13    Q.  Okay.  So you're not in a position to tell us
14  the reason for the redaction or that sort of thing, this
15  e-mail; is that right?
16    A.  Correct.
17    Q.  I'll move on to the next document, and this is
18  another -- a multi-page document.  It starts at Ecolab
19  001226.
20    A.  Okay.
21    Q.  And if we sent this correctly, it should be
22  Pages 1226 through 1235.  Is that reflected on your copy
23  there?
24      MR. KILBY:  He's just scanning through the
25    document, so he's working his way to the end of it.

Page 76

1      MR. ROGERS:  That's fine.
2      THE WITNESS:  Yes.
3  BY MR. ROGERS:
4    Q.  Okay.  And if I understand this document
5  correctly, this is an e-mail chain that was initiated by
6  you, Russell Berman, on June 19th, 2023, to -- I'm going
7  to mispronounce these names, I'm sure -- Seong Hoon
8  Yoon, with copies to Craig Coldiron and Kaustav Ghosh.
9  Do you see where I'm referring to as the first --
10  chronologically, the first e-mail from June 19th
11  there --
12    A.  Yes.
13    Q.  -- on the second document?
14    A.  Yes.
15    Q.  Okay.  Thank you.  This is, in fact, an e-mail
16  chain that you initiated to those individuals who I
17  identified?
18    A.  Yes.
19    Q.  Okay.  I'm going to put this in as Exhibit 5
20  to the deposition.  And I want to ask you, who is Seong
21  Hoon Yoon, in terms of that person's role at Ecolab as
22  it pertains to that Denver pilot?
23           (EXHIBIT 5 MARKED FOR IDENTIFICATION)
24    A.  Seong Hoon is, in fact, a -- a scientist at
25  Ecolab, particularly under the Nalco Water side, and his

Page 77

1  direct relation to the e-mail and -- and Denver is that
2  he has a Ph.D. in ceramic membrane filtration.
3  BY MR. ROGERS:
4    Q.  Okay.  Now, the attachments that constitute
5  the last several pages of this document -- I guess it's
6  from Page 1228 through 1235.  Is that the attachment to
7  the e-mail that we've been discussing?
8    A.  Can you clarify?  I'm -- I'm not following
9  your line of questioning.
10    Q.  The document I'm looking at is the Pages 1226
11  through 1235.  To me it looks like the first two pages
12  is an e-mail chain, and the remaining pages are a Power
13  -- constitute a PowerPoint presentation that was
14  attached as an attachment to the e-mail chain.  I just
15  want to understand if that is correct.
16    A.  I'd have -- I'd have to -- I mean, I'd have to
17  see the original e-mail, but it does appear that -- yes,
18  that these are, yeah, PowerPoint slides.
19    Q.  Okay.  And the -- I know most of the
20  information in the PowerPoint slides is redacted.  Is it
21  -- is the information that was removed from the
22  PowerPoint slides technical type information about the
23  water filtration system or technology or so forth that
24  Mr. Yoon was involved with?
25    A.  I -- I -- I'd have to go back and double

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  check, but my recollection tells me yes.
2      Q.   Okay.  Do you know generally why there would
3  be a PowerPoint presentation?  Well, strike that.  I'll
4  withdraw that.  In terms of the e-mail chain itself, the
5  first two pages, there are some redactions to the bodies
6  of two of the e-mails.  One was an e-mail that looks
7  like it was sent from you to Seong Hoon Yoon and a
8  carbon copy to those other two individuals on June 21st.
9  Do you see that?
10     A.   I do.
11     Q.   Okay.  Do you know generally what type of
12 information was redacted from that e-mail?
13     A.   I don't.
14     Q.   Okay.  With respect to the e-mail above that,
15 the e-mail from Yoon to Carl Mattson, Paul Barry, and
16 then carbon copy two others, from June 24th, do you see
17 that e-mail at the top?
18     A.   Yes.
19     Q.   There's a redaction in the body of that e-
20 mail.  Do you know what the nature of the information
21 that was redacted from this e-mail is?
22     A.   I -- I don't.
23     Q.   That's all I have on that document.  The next
24 one I wanted to ask about is Ecolab 1237.
25     A.   Okay.

1      Q.   Let me know if you've got that up and if
2  you've had a chance to take a look at it.  Mr. Berman,
3  are you still reviewing the document?
4      A.   I am.
5      Q.   Okay.  I didn't mean to interrupt.  I just
6  wanted to make sure we're on the same page.
7      A.   Yeah.  No, I appreciate that.  Bear with me.
8  Okay.
9      Q.   Do you remember starting this e-mail chain
10 generally?  Looks like you were going to be out, maybe
11 on vacation or some other reason, in late July, if I
12 read this correctly?
13     A.   Yes.
14     Q.   Was it a vacation or something of that sort?
15     A.   Yes.
16     Q.   Okay.  And this e-mail chain begins with that
17 e-mail on July 28th where you tell Craig Coldiron that
18 Bill is covering for you while you're out next week.  And
19 I'm curious to know who Craig Coldiron and Bill Simpson
20 are at Ecolab and how it relates to the Denver pilot?
21     A.   Craig Coldiron is our -- our divisional
22 engineer, and Bill Simpson at the time was the VP of
23 sales for the division.
24     Q.   Okay.  At the time, was Mr. Simpson the person
25 to whom you directly reported in your role?

1      A.   Yes.
2      Q.   On the initial page of this document, which is
3  Bates marked Ecolab 1237, about halfway down there's an
4  e-mail from Craig Coldiron to Bill Simpson and you, with
5  a carbon copy to Mr. Mattson, Mr. Pavlatos, and
6  Frederick Kolenda.  Do you see that?
7      A.   I do.
8      Q.   There is some information that appears to have
9  been redacted from that e-mail.  Do you see that?
10     A.   I do.
11     Q.   Do you know the -- excuse me -- the general
12 nature of the information that was redacted from that e-
13 mail?
14     A.   No.  I -- I would have to go back and look at
15 the original e-mail.
16     Q.   Okay.  What is the -- what's the role of Paul
17 Barry at the time with Ecolab, as it relates to the
18 pilot project, if you know?
19     A.   Paul Barry is -- or yeah.  Continues to be the
20 -- the division's kind of subject matter expert with
21 regard to ceramic membrane filtration.  In addition to
22 that, both Paul Barry and I managed that location when
23 it was owned by G&K Services.
24     Q.   So Mr. Barry worked in the sphere of water
25 filtration, ceramic filtration, at least in part, was

1  alongside Mr. Yoon; is that right?
2      A.   That -- that's his -- that's kind of his first
3  name.  But the -- say the beginning again?  I -- I
4  missed the initial part.
5      Q.   I -- I'm just driving at this.  We talked
6  about Mr. -- and I'm just to get the name wrong again.
7  Hoon?
8      A.   Seong --
9      Q.   Yoon.
10     A.   Seong Hoon.  Yep.  Seong Hoon.
11     Q.   Being a Ph.D. in this ceramic filtration
12 topic, and it sounds like perhaps Paul Barry also works
13 in that same -- on that same topic?
14     A.   Yes and no.  So Seong Hoon is a -- a true
15 expert in the design and operation of ceramic membrane
16 filtrations.  Mr. Barry has intimate knowledge of that
17 facility in that ceramic membrane filtration previously,
18 plus he understands commercial laundries.  So he helped
19 Seong bridge the divide between that of the mechanics
20 and operation of a ceramic membrane filtration and how
21 that applied to commercial laundry.
22     Q.   Okay.  Thank you.  There's one other name on
23 this e-mail chain that I am not familiar with, and
24 that's Frederick Kolenda.  Who is Frederick Kolenda in
25 terms of the role at Ecolab and as it pertains to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  Denver pilot?
2      A.  He is a territory manager at Ecolab, and he
3  had absolutely nothing to do with the Denver pilot.
4      Q.  Okay.  Thank you for that.
5          MR. ROGERS:  I want to put this e-mail chain
6      in as Exhibit 6, please.
7          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
8  BY MR. ROGERS:
9      Q.  And I'll move on to the next one, which is
10  Ecolab 1242.
11      A.  Okay.  So it appears that the origin 1225 and
12  1224 are the same e-mail that Mr. Mattson -- originated
13  from Mr. Mattson to Mr. Pavlatos --
14      Q.  I think --
15      A.  -- and then Mr. Pavlatos responding; is that
16  correct --
17      Q.  I don't think we're on the same page.  I'm
18  looking at Ecolab 1242.
19      A.  Oh, 1242.  Excuse me.
20      Q.  I misspoke.  I apologize, but --
21      A.  1242.  Okay.
22      Q.  Yes, sir.
23      A.  All right.  So 1242.  Yes.  So e-mail from
24  Mr. Vesely to Mr. Mattson, Pavlatos, and then a response
25  from Mr. Bialza.

Page 83

1      Q.  Okay.  Do you have any knowledge of the
2  general nature of the information that was redacted in
3  the June 18th e-mail from Mr. Vesely at the bottom of
4  this page?
5      A.  I do not.
6      Q.  Okay.  There is a Matt Mueller copied on the
7  e-mail.  Who is -- who's that person?
8      A.  That is Doug Bialza's direct supervisor.
9      Q.  Okay.  And there's a Harry Bohl, B-O-H-L.
10  Who's that individual?
11      A.  He is a -- an -- what we call an installer,
12  right?  He -- he would be the folks who would be helping
13  with the -- the installation -- the -- the mechanical
14  mechanism of the installation, so the tubing and the
15  wiring of the machines, et cetera.
16      Q.  And then there is a Gregory Scott Gerber.  What
17  was that person's role?
18      A.  Yeah.  Harry reports to Mr. Gerber.
19          MR. ROGERS:  Okay.  I'm going to put this in
20      as Exhibit 7, please.  There is another document
21      that was omitted from the link that we sent this
22      morning, but I think Suzie has followed up with
23      this document.  It's Ecolab 1090.  And, Mr. Berman,
24      you may not yet have it.  But, Matt, if we could
25      get -- it's a one- pager.  If we could get that to

Page 84

1      Mr. Berman?  I want to ask questions about that,
2      please.
3          (EXHIBIT 7 MARKED FOR IDENTIFICATION)
4          MR. KILBY:  Okay.  So do I need to -- is that
5      a new share file link, or do I go to the original
6      share file link and it's there now?
7          MR. ROGERS:  Suzie?
8          MS. MARINO:  I just sent it as an e-mail
9      attachment.
10          MR. KILBY:  Oh, it's just an e-mail
11      attachment, so I just need to go to my e-mail.
12      Okay.
13          MR. ROGERS:  It's just a -- it should just be
14      a one-page document.
15          MR. KILBY:  Okay.  Give me a second.  I'm
16      going to forward it to him right now.  Okay.  It
17      might take a minute for it to come across to his
18      computer, but I've just sent it to him.
19          MR. ROGERS:  It's fine.
20          MR. KILBY:  Okay.  He's got it.  He's just
21      looking at it now.
22          MR. ROGERS:  Thank you.
23          THE WITNESS:  Okay.
24  BY MR. ROGERS:
25      Q.  All right.  We're looking at the document,

Page 85

1  Bates numbered Ecolab 1090.  This appears to be an e-
2  mail chain that starts with the same e-mail that we've
3  seen earlier this morning.  That is the Nick Wagner,
4  July 11th e-mail to Adam Vesely and Jerry Pavlatos.  Do
5  you agree with that?
6      A.  Yes.
7      Q.  And then I believe we've also seen that
8  immediate response from Mr. Vesely to Mr. Wagner dated
9  July 11th at 9:18 p.m.  Do you recall that about the 900
10  Ellis machine?
11      A.  Yes, I do.
12      Q.  Okay.  And so at the top, there's an
13  additional -- it looks like an additional e-mail, and
14  this one is from Mr. Wagner to Mr. Vesely on July 12th.
15  Do you see that?
16      A.  Yes, I do.
17      Q.  The -- there are redactions of three words on
18  that e-mail.  There's one in the subject and a couple in
19  the first paragraph.  Do you see those?
20      A.  I do.
21      Q.  Would that be -- obviously, the subject is the
22  -- presumably the same.  Would the two redactions in the
23  first paragraph be the same chemical name or chemical
24  identification that we talked about earlier that was
25  redacted in other iterations of this e-mail chain?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1      MR. KILBY:  Objection.  Calls for speculation.
2      THE WITNESS:  I'd be speculating.
3  BY MR. ROGERS:
4      Q.  Okay.  Could be -- it could be something else.
5  You just don't know because it would be speculation.  Is
6  that fair to say?
7      A.  It -- it is fair to say that I -- I'm looking
8  at the -- the message.  I was not on the original
9  message, and I'm -- I'm seeing exactly what you stated.
10     Q.  Okay.  The -- have you seen that e-mail before
11 today, the top e-mail from Nick Wagner to Adam Vesely
12 that begins with, "Thank you, Adam.  This is perfect"?
13     A.  I -- I've seen exactly what you've shown me,
14 yes, with the redactions.
15     Q.  Okay.  The reference in the second paragraph -
16 - well, the first paragraph and the second paragraph to
17 someone named Derek, D-E-R-E-K, is that -- to your
18 understanding, is that Derek Colwell?
19     A.  That would be my understanding, yes.
20     Q.  Okay.  In that last sentence of the second
21 paragraph of that e-mail, it says, "Do you have an open
22 line of communication with him, or is this a Jerry
23 question?"  Do you see that?
24     A.  I do.
25     Q.  Do you know who the Jerry is who's referenced

Page 87

1  in this e-mail?
2      A.  Yes.
3      Q.  Is that Jerry Pavlatos?
4      A.  Yes.
5      Q.  I want to put this in as Exhibit 8 to the
6  deposition.  I appreciate your going along with that.  We
7  omitted it earlier.
8         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
9      MR. ROGERS:  I've got 11:54.  I know we've had
10 a few breaks.  I want to take one final break, if
11 we can, and then wrap things up, hopefully in
12 relatively quick order.  Does that work for the
13 group.
14     MR. KILBY:  Yeah.  That's just fine.
15     MR. ROGERS:  Okay.  So we'll be back on in a
16 few.  Thank you.
17        (OFF THE RECORD)
18     THE REPORTER:  And we are on record.
19     MR. ROGERS:  Mr. Berman, I've looked over my
20 notes, and those are all the questions that I've
21 got for you this morning.  I appreciate your time
22 and your patience with me.  Thank you, sir.
23     THE WITNESS:  You're very welcome.  Thank you.
24     MR. KILBY:  We have no questions for him, so
25 we can close the deposition.

Page 88

1      THE REPORTER:  All right.  Before we get off
2  record, Mr. Rogers, how would you like a copy of
3  your transcript?
4      MR. ROGERS:  I would like it as expedited as
5  possible ahead of the hearing that we have next
6  Thursday.  I will need an original and an E-Tran,
7  please.
8      THE REPORTER:  Okay.  And Mr. Kilby, how would
9  you like your transcript order?
10     MR. KILBY:  The same.  I think --
11     THE REPORTER:  Is that expedited as --
12     MR. KILBY:  -- that Mr. Rogers places a great
13 order, so I'll copy off of his homework.
14     THE REPORTER:  And you would like it
15 expedited, as well?
16     MR. KILBY:  Yes, ma'am.  That'd be great.
17     THE REPORTER:  Okay.  All right.  And I will
18 get us off record.
19        (DEPOSITION CONCLUDED AT 12:06 P.M. ET)
20
21
22
23
24
25

Page 89

1            CERTIFICATE OF REPORTER
2               STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page here of by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded digitally by me and then reduced to
10 typwritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skill and ability.  I certify that I am not a
13 relative or employee of either counsel, and that I am in
14 no way interested financially, directly or indirectly,
15 in this action.
16
17
18
19      Hannah Brandenstein
20
21
22 HANNAH BRANDENSTEIN,
23 COURT REPORTER/NOTARY
24 COMMISSION EXPIRES:  09/27/2031
25 SUBMITTED ON:  01/08/2024

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

Message

---

**From:**   Vesely, Adam [Adam.Vesely@ecolab.com]
**Sent:**   6/23/2023 3:25:10 AM
**To:**   Wilhoit, Thomas [Thomas.Wilhoit@ecolab.com]
**Subject:**   RE: softrol


Tom—thank you! Still haven't had luck getting my cable to work, but was at least able to save a site backup to my laptop using your "backdoor" directions. Thank you for your help, as always!!

Sincerely,

Adam

> **EXHIBIT**
>
> **1**

**From:** Wilhoit, Thomas <Thomas.Wilhoit@ecolab.com>
**Sent:** Thursday, June 22, 2023 3:48 PM
**To:** Vesely, Adam <Adam.Vesely@ecolab.com>
**Subject:** softrol


**ECOLAB** Protecting What's Vital.™
**Tom Wilhoit**
Territory Specialist, Aramark | TEXTILE CARE
**ECOLAB** 1 Ecolab Place | ST. PAUL, MN 55102
**M** 816-830-6967 **E** **thomas.wilhoit@ecolab.com**

ECOLAB001086

**EXHIBIT**

**2**

Message

| | |
|---|---|
| **From:** | Vesely, Adam [Adam.Vesely@ecolab.com] |
| **Sent:** | 7/11/2023 7:27:46 PM |
| **To:** | Wagner, Nick [Nick.Wagner@ecolab.com]; Pavlatos, Jerry [Jerry.Pavlatos@ecolab.com] |
| **Subject:** | Re: Denver REDACTED |

Hi Nick I'll go through my site backup and let you know.

Adam

**From:** Wagner, Nick <Nick.Wagner@ecolab.com>
**Sent:** Tuesday, July 11, 2023 1:00:21 PM
**To:** Vesely, Adam <Adam.Vesely@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>
**Subject:** Denver REDACTED

Team,

I am looking for clarification on which formulas are currently using REDACTED at Denver.  The only one I have on my list are the butcher coats due to marijuana smell.  Are there any other classifications where the smell is a concern?  Currently using REDACTED ?

Thanks,

**Nick Wagner**
LEAD CHEMIST – TEXTILE CARE DIVISION

**ECOLAB** 655 LONE OAK DRIVE, EAGAN, MN 55121
**T** 651 795 5503 **F** 651 204 7506 **E** nick.wagner@ecolab.com

ECOLAB001085

**EXHIBIT**

**3**

Message

| | |
|---|---|
| **From:** | Vesely, Adam [Adam.Vesely@ecolab.com] |
| **Sent:** | 7/12/2023 2:18:21 AM |
| **To:** | Wagner, Nick [Nick.Wagner@ecolab.com] |
| **Subject**: | RE: Denver REDACTED |
| **Attachments:** | Cintas Denver Chemistry 900.xlsx |

Nick, here's what I have. I'm not sure if they call REDACTED something else, but this is their current dosing in a 900 Ellis.

Adam

---

**From:** Wagner, Nick <Nick.Wagner@ecolab.com>
**Sent:** Tuesday, July 11, 2023 1:00 PM
**To:** Vesely, Adam <Adam.Vesely@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>
**Subject:** Denver REDACTED

Team,

I am looking for clarification on which formulas are currently using REDACTED at Denver.  The only one I have on my list are the butcher coats due to marijuana smell.  Are there any other classifications where the smell is a concern?  Currently using REDACTED?

Thanks,

**Nick Wagner**
LEAD CHEMIST – TEXTILE CARE DIVISION

**ECOLAB** 655 LONE OAK DRIVE, EAGAN, MN 55121
**T** 651 795 5503 **F** 651 204 7506 **E** nick.wagner@ecolab.com

Message

EXHIBIT

4

| | |
|---|---|
| **From:** | Pavlatos, Jerry [Jerry.Pavlatos@ecolab.com] |
| **Sent:** | 8/4/2023 8:56:33 PM |
| **To:** | Mattson, Carl [Carl.Mattson@ecolab.com]; Bialza, Douglas [Douglas.Bialza@ecolab.com]; Vesely, Adam [Adam.Vesely@ecolab.com]; Aki, Akamu [Akamu.Aki@ecolab.com]; El-Sarji, Mustapha [mustapha.el-sarji@ecolab.com]; Barry, Paul (Tex Care) [Paul.Barry@ecolab.com]; Coldiron, Craig [Craig.Coldiron@ecolab.com]; Bohl, Harry [harry.bohl@ecolab.com]; Baca, Ariel [Ariel.Baca@ecolab.com] |
| **CC:** | Simpson, Bill [Bill.Simpson@ecolab.com]; Girotra, Mukul [mukul.girotra@ecolab.com]; Mueller, Matt [Matthew.Mueller@ecolab.com]; Berman, Russell [Russell.Berman@ecolab.com]; Trenberth, Kyle [Kyle.Trenberth@ecolab.com] |
| **Subject:** | Re: Denver Start-Up |

Very well said Carl and great job team!  Thank you for going the extra mile every day...

**Jerry Pavlatos**
CORPORATE ACCOUNT MANAGER, TEXTILE CARE

**ECOLAB** 1 ECOLAB PLACE, ST. PAUL, MN 55102

**T** 800 553 8683  **M** 224 203 9099  **E** Jerry.Pavlatos@ecolab.com

Connect With Us
LinkedIn  |  Facebook  |  Twitter  |  Instagram  |  YouTube

**CONFIDENTIALITY NOTICE:** *This e-mail communication and any attachments may contain proprietary and privileged information for the use of the designated recipients named above. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

---

**From:** Mattson, Carl <Carl.Mattson@ecolab.com>
**Sent:** Friday, August 4, 2023 3:04 PM
**To:** Bialza, Douglas <Douglas.Bialza@ecolab.com>; Vesely, Adam <Adam.Vesely@ecolab.com>; Aki, Akamu <Akamu.Aki@ecolab.com>; El-Sarji, Mustapha <mustapha.el-sarji@ecolab.com>; Barry, Paul (Tex Care) <Paul.Barry@ecolab.com>; Coldiron, Craig <Craig.Coldiron@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>; Bohl, Harry <harry.bohl@ecolab.com>; Baca, Ariel <Ariel.Baca@ecolab.com>
**Cc:** Simpson, Bill <Bill.Simpson@ecolab.com>; Girotra, Mukul <mukul.girotra@ecolab.com>; Mueller, Matt <Matthew.Mueller@ecolab.com>; Berman, Russell <Russell.Berman@ecolab.com>; Trenberth, Kyle <Kyle.Trenberth@ecolab.com>
**Subject:** Denver Start-Up

Team,

I wanted to take a moment and thank everyone for their effort this week in converting the Cintas Denver to our chemistry. **Redacted** Redacted along with many other items, and most importantly acted with total professionalism and acted as a team with constant communication and support for one another and for the plant to answer any questions they had during the conversion.   There is more work to be accomplished here but we as a team made a great start this past week.

The plant as of this afternoon is ecstatic with the quality and with how the CMF is performing on day 3 of our chemistry.

Each of us should go into the weekend feeling proud of what we accomplished this past week and look forward to working with this team again in the future.

Stay safe & healthy,

**Carl Mattson**
Customer Success Manager
1 Ecolab Place, St. Paul, MN 55102
**T** 800 553 8683  **M** 609 760 5003
**E** Carl.Mattson@ecolab.com
**ecolab.com**



Connect With Us
LinkedIn  |  Facebook  |  Twitter  |  Instagram  |  YouTube

ECOLAB001225

**EXHIBIT**

_5_

Message

| | |
|---|---|
| **From:** | Yoon, Seong Hoon [syoon@ecolab.com] |
| **Sent**: | 6/24/2023 1:40:59 AM |
| **To**: | Mattson, Carl [Carl.Mattson@ecolab.com]; Barry, Paul (Tex Care) [Paul.Barry@ecolab.com] |
| **CC**: | Coldiron, Craig [Craig.Coldiron@ecolab.com]; Ghosh, Kaustav [Kaustav.Ghosh@ecolab.com]; Berman, Russell [Russell.Berman@ecolab.com]; Wagner, Nick [Nick.Wagner@ecolab.com] |
| **Subject:** | RE: Current CMF Images |
| **Attachments:** | To improve CMF performance, Cintas Denver.pptx |

Paul, Carl, Craig, and Nick

Thanks for the warm welcoming yesterday.

> **Redacted** Please let me know what should be modified
or feel free to modify.

Have a great weekend for all.

Seong Hoon

**From:** Berman, Russell <Russell.Berman@ecolab.com>
**Sent:** Wednesday, June 21, 2023 8:36 AM
**To:** Yoon, Seong Hoon <syoon@ecolab.com>
**Cc:** Coldiron, Craig <Craig.Coldiron@ecolab.com>; Ghosh, Kaustav <Kaustav.Ghosh@ecolab.com>
**Subject:** RE: Current CMF Images

Very welcome Seong,

> # Redacted

Carl Mattson and Paul Barry will be your conduct for information and connecting you with the local engineering
team. **Redacted** and will be able to share that information
with you upon your arrival.

Thank you again for your support!

Warm regards,

**Russell Berman**
Director of Business Development, Textile Care

**ECOLAB**  Tampa, FL 33547
**T**  800 553 8683  **C**  813 362 4087  **E**  russell.berman@ecolab.com

**From:** Yoon, Seong Hoon <syoon@ecolab.com>
**Sent:** Monday, June 19, 2023 6:32 PM
**To:** Berman, Russell <Russell.Berman@ecolab.com>
**Cc:** Coldiron, Craig <Craig.Coldiron@ecolab.com>; Ghosh, Kaustav <Kaustav.Ghosh@ecolab.com>
**Subject:** Re: Current CMF Images

Russell,

Those are fantastic preview. It will save hours of my time on-site. Greatly appreciated.

Seong Hoon

Seong Hoon Yoon, PhD, PE
Water Anchor R&D
Separation Technologies

---

**From:** Berman, Russell <Russell.Berman@ecolab.com>
**Sent:** Monday, June 19, 2023 5:28:50 PM
**To:** Yoon, Seong Hoon <syoon@ecolab.com>
**Cc:** Coldiron, Craig <Craig.Coldiron@ecolab.com>; Ghosh, Kaustav <Kaustav.Ghosh@ecolab.com>
**Subject:** Current CMF Images

FYI

Warm regards,

**Russell Berman**
Director of Business Development, Textile Care

**ECOLAB**  Tampa, FL 33547
**T**  800 553 8683  **C**  813 362 4087  **E**  russell.berman@ecolab.com

ECOLAB001227



## INTRODUCTION

- Customer          CINTAS Denver
- Date of survey    6/22/2023
- Status
- Goal

Written by Seong Hoon Yoon, Water Anchor R&D

**ECOLAB** | **NALCO** Water    CONFIDENTIAL







ECOLAB001231



ECOLAB001232



ECOLAB001233





Water Anchor RD&E

ECOLAB001235

**EXHIBIT**

6

Message

| | |
|---|---|
| **From:** | Simpson, Bill [Bill.Simpson@ecolab.com] |
| **Sent**: | 8/3/2023 12:27:34 PM |
| **To**: | Coldiron, Craig [Craig.Coldiron@ecolab.com]; Berman, Russell [Russell.Berman@ecolab.com] |
| **CC**: | Mattson, Carl [Carl.Mattson@ecolab.com]; Pavlatos, Jerry [Jerry.Pavlatos@ecolab.com]; Kolenda, Frederick [frederick.kolenda@ecolab.com] |
| **Subject:** | RE: Covers |

Craig,

Thank you for the update, insights, and all of your and the team's hard work! Please thank the team for everything they are doing! Great job!

**Bill Simpson**
Vice President, TCD Sales NA

**ECOLAB** 1 Ecolab Place St. Paul, MN 55102
**T** 651 250 4931 **F** 651 306 5198 **E** bill.simpson@ecolab.com

---

**From:** Coldiron, Craig <Craig.Coldiron@ecolab.com>
**Sent:** Wednesday, August 2, 2023 10:52 PM
**To:** Simpson, Bill <Bill.Simpson@ecolab.com>; Berman, Russell <Russell.Berman@ecolab.com>
**Cc:** Mattson, Carl <Carl.Mattson@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>; Kolenda, Frederick <frederick.kolenda@ecolab.com>
**Subject:** RE: Covers

Bill, Russell,

Things are going well.

It is amazing that this is only Wednesday given the amount of work that the team has done. **Redacted**
**Redacted**
**Redacted** The team has been busy. **Redacted**
**Redacted** As with any startup, issues come up. Old washer controllers are a good example.  As soon as the team identified the issue, parts were ordered to correct the problem.   The parts will be delivered early tomorrow morning. **Redacted**
**Redacted** Our team has done an excellent job of adjusting as needed.

As a side note,  WSI asked Stephen Kolher (Cintas) why their computer was turned off yesterday at noon.  When Stephen arrived today, he asked us what happened. We told him that we had already taken the wash floor by that time.  WSI was surprised that we had converted so quickly.

Tomorrow we will continue to monitor the quality and chemical dosing to deliver the correct outcome.

Let me know if you have any questions.

Craig Coldiron
EQUIPMENT AND DISPENSING MANAGER, TEXTILE CARE

**ECOLAB**  16036 Clarkson Woods Drive Chesterfield, Missouri 63017
**M** 314 616 3609  **E** Craig.Coldiron@ecolab.com

**From:** Simpson, Bill <Bill.Simpson@ecolab.com>
**Sent:** Wednesday, August 2, 2023 6:55 PM
**To:** Coldiron, Craig <Craig.Coldiron@ecolab.com>; Berman, Russell <Russell.Berman@ecolab.com>
**Cc:** Mattson, Carl <Carl.Mattson@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>; Kolenda, Frederick <frederick.kolenda@ecolab.com>
**Subject:** RE: Covers

Craig,

      Thank you for the update and yes we did hear everything went well. How is everything going in Denver?

Fred,

      Great work and thank you for all you did to make Milford a great success.

**Bill Simpson**
Vice President, TCD Sales NA

**ECOLAB** 1 Ecolab Place St. Paul, MN 55102
**T** 651 250 4931 **F** 651 306 5198 **E** bill.simpson@ecolab.com

**From:** Coldiron, Craig <Craig.Coldiron@ecolab.com>
**Sent:** Tuesday, August 1, 2023 6:32 PM
**To:** Simpson, Bill <Bill.Simpson@ecolab.com>; Berman, Russell <Russell.Berman@ecolab.com>
**Cc:** Mattson, Carl <Carl.Mattson@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>; Kolenda, Frederick <frederick.kolenda@ecolab.com>
**Subject:** RE: Covers

Good Evening from Denver,

I am not sure if anyone has reached out to you but it sounds like the tour in Milford went well.  We spoke and texted with Fred early on this morning to make sure he was supported.  Fred did an excellent job of making sure our best foot was put forward.  Great job Fred.

Have a nice evening.

Craig Coldiron
EQUIPMENT AND DISPENSING MANAGER,TEXTILE CARE

**ECOLAB**   16036 Clarkson Woods Drive Chesterfield, Missouri 63017
**M** 314 616 3609   E Craig.Coldiron@ecolab.com

**From:** Simpson, Bill <Bill.Simpson@ecolab.com>
**Sent:** Friday, July 28, 2023 4:52 PM
**To:** Coldiron, Craig <Craig.Coldiron@ecolab.com>; Berman, Russell <Russell.Berman@ecolab.com>
**Subject:** RE: Covers

Craig,
Thank you and couldn't agree more that we have an awesome TEAM all over this Cintas opportunity. If you need anything don't hesitate to reach out and thanks for all you are doing. Have a great weekend.

Russell,

      Have a great and well deserved vacation.

ECOLAB001238

**Bill Simpson**
Vice President, TCD Sales NA

**ECOLAB** 1 Ecolab Place St. Paul, MN 55102
**T** 651 250 4931 **F** 651 306 5198 **E** bill.simpson@ecolab.com

---

**From:** Coldiron, Craig <Craig.Coldiron@ecolab.com>
**Sent:** Friday, July 28, 2023 4:25 PM
**To:** Berman, Russell <Russell.Berman@ecolab.com>
**Cc:** Simpson, Bill <Bill.Simpson@ecolab.com>
**Subject:** RE: Covers

Thank you for letting me know.  We have a great team going to Denver next week.  We should be good.  The pre-install by the team looks good.  We had a good Cintas team call today preparing for the tour on Tuesday.  We have Juan and Jack monitoring the system Monday and Tuesday.  Fred will be there Monday and Tuesday also.  Fred and I discussed the flow issues and have a game plan for Monday when he gets there.

Have a nice vacation and try and detach just a bit.  I know you won't for very long.

Thanks for a great week.  Just a preview of coming attractions.

Bill, if you have any questions let me know.

**Craig Coldiron**
EQUIPMENT AND DISPENSING MANAGER,TEXTILE CARE

**ECOLAB**   16036 Clarkson Woods Drive Chesterfield, Missouri 63017
**M** 314 616 3609   **E** Craig.Coldiron@ecolab.com

---

**From:** Berman, Russell <Russell.Berman@ecolab.com>
**Sent:** Friday, July 28, 2023 4:12 PM
**To:** Coldiron, Craig <Craig.Coldiron@ecolab.com>
**Cc:** Simpson, Bill <Bill.Simpson@ecolab.com>
**Subject:** Covers

Craig,

Bill is covering for me while I'm out next week.  Not that you need it, but if you should need assistance please reach out to Bill.

Thank you and All the best next week in Denver.

Warm regards,

**Russell Berman**
Director of Business Development, Textile Care

**ECOLAB**  Tampa, FL 33547
**T**  800 553 8683  **C**  813 362 4087  **E**  russell.berman@ecolab.com

Message

**EXHIBIT**

7

| | |
|---|---|
| **From:** | Bialza, Douglas [Douglas.Bialza@ecolab.com] |
| **Sent**: | 6/19/2023 4:21:55 AM |
| **To**: | Vesely, Adam [Adam.Vesely@ecolab.com]; Mattson, Carl [Carl.Mattson@ecolab.com]; Pavlatos, Jerry [Jerry.Pavlatos@ecolab.com] |
| **CC:** | Mueller, Matt [Matthew.Mueller@ecolab.com]; Coldiron, Craig [Craig.Coldiron@ecolab.com]; Bohl, Harry [harry.bohl@ecolab.com]; Gerger, Gregory Scott [GregoryScott.Gerger@ecolab.com] |
| **Subject:** | RE: Help from Harry this week |

This should be more than fine Adam.

Mahalo Nui Loa,

**Doug Bialza Jr**
**District Manager - Northwest**
**Textile Care North America**
**Ecolab 1 Ecolab Place, St. Paul MN 55102**
**C – 503-991-9326**
**E -** douglas.bialza@ecolab.com
**CONFIDENTIALITY NOTICE**: *This e-mail communication and any attachments may contain proprietary and privileged information for the use of the designated recipients named above. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

---

**From:** Vesely, Adam <Adam.Vesely@ecolab.com>
**Sent:** Sunday, June 18, 2023 9:18 PM
**To:** Mattson, Carl <Carl.Mattson@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>
**Cc:** Mueller, Matt <Matthew.Mueller@ecolab.com>; Coldiron, Craig <Craig.Coldiron@ecolab.com>; Bohl, Harry <harry.bohl@ecolab.com>; Bialza, Douglas <Douglas.Bialza@ecolab.com>; Gerger, Gregory Scott <GregoryScott.Gerger@ecolab.com>
**Subject:** Help from Harry this week

Hi guys,

Not sure what has already been communicated, but in addition to Harry helping out with the Cintas Denver survey, it

# Redacted

Redacted and I need to take advantage of having an installer in Denver REDACTED Appreciate your understanding and see you tomorrow.

Sincerely,

Adam

| EXHIBIT |
| --- |
| 8 |

Message

**From:**      Wagner, Nick [Nick.Wagner@ecolab.com]
**Sent:**      7/12/2023 1:08:09 PM
**To:**        Vesely, Adam [Adam.Vesely@ecolab.com]
**Subject**:    RE: Denver REDACTED

Thank you Adam, this is perfect!  I am a little confused on the REDACTED use (or lack thereof) on the white butcher coats.  From my notes and what Jerry had said earlier is that Derek said they used REDACTED on the butcher coats as they are used in grow houses/etc and it helps with the smell.  Did they maybe start washing the green house stuff on the butcher coat formula?  I also see that that is a non-use formula now.

We may have to make some adjustments to the formulas once we get that clarification.  Is this something we could talk with Derek about to get that clarification ahead of time?  Do you have an open line of communication with him, or is this a Jerry question?

Thank you again for all your help!
Nick

**From:** Vesely, Adam <Adam.Vesely@ecolab.com>
**Sent:** Tuesday, July 11, 2023 9:18 PM
**To:** Wagner, Nick <Nick.Wagner@ecolab.com>
**Subject:** RE: Denver REDACTED

Nick, here's what I have. I'm not sure if they call REDACTED something else, but this is their current dosing in a 900 Ellis.

Adam

**From:** Wagner, Nick <Nick.Wagner@ecolab.com>
**Sent:** Tuesday, July 11, 2023 1:00 PM
**To:** Vesely, Adam <Adam.Vesely@ecolab.com>; Pavlatos, Jerry <Jerry.Pavlatos@ecolab.com>
**Subject:** Denver REDACTED

Team,

I am looking for clarification on which formulas are currently using REDACTED at Denver.  The only one I have on my list are the butcher coats due to marijuana smell.  Are there any other classifications where the smell is a concern?  Currently using REDACTED ?

Thanks,

**Nick Wagner**
LEAD CHEMIST – TEXTILE CARE DIVISION

**ECOLAB** 655 LONE OAK DRIVE, EAGAN, MN 55121
**T** 651 795 5503 **F** 651 204 7506 **E** nick.wagner@ecolab.com